[L.A. No. 29892. In Bank. Feb. 4, 1972.]

In re RICHARD ALDEN HIGBIE on Suspension of License.

564

**COUNSEL**

Blair Barnette, Higbie & Higbie and Suzanne Robinson for Petitioner.

F. LaMar Forshee, Herbert M. Rosenthal, Ronald W. Stovitz and Christopher M. Reuss for Respondent.

## OPINION

**THE COURT.**—In this disciplinary proceeding we must consider whether the course of conduct of an attorney culminating in his conviction for failure to pay a federal marijuana transfer tax involves moral turpitude, and if so, the nature and extent of the appropriate discipline. We conclude that failure to pay the tax does not constitute moral turpitude per se, but that respondent attorney's conduct does reflect moral turpitude. Because the dominant legitimate motivation for respondent's wrongful behavior was apparently not personal profit and because respondent's professional record serves as a mitigating factor, we conclude that he should not be disbarred but that he should be suspended from the practice of law for two years, with an actual suspension of one year.

We draw the facts from the State Bar's brief, from respondent's testimony before the special administrative committee assigned to hear his case, and from 14 letters submitted to the State Bar by persons known to respondent in professional or community relationships. Both the Bar and respondent have stipulated to the "essential truth" of the facts presented in these sources.

Respondent has practiced law in Orange County since his certification by this court in 1958. During this time, even during the period following his conviction for the offense now under consideration, he has enjoyed an excellent reputation among members of his community. In particular, his clients and fellow attorneys have expressed a high regard for his competence, trustworthiness, and unselfishness, as well as for his willingness to provide professional services to those in need. As the facts to follow will disclose, respondent's excessive exercise of the last of these characteristics may well account for the conduct that led to this proceeding.

Among the persons whom respondent has helped over the years is John Bagley, a free lance pilot whom respondent has assisted since 1956 by providing loans, jobs, referrals for jobs, and occasional legal representation. In July 1968 Bagley, whose wife and mother faced serious illnesses, approached respondent with a request for a $200 loan. At this time respondent's investments were in unfortunate condition; moreover, Bagley stood in considerable debt to respondent. For these reasons respondent refused to lend the requested sum but suggested that he might be able to locate work for Bagley.

In the months prior to Bagley's request for a loan, respondent became socially acquainted with a group of young adults who evidently desired to obtain sources of marijuana for themselves and for distribution to others. Although respondent did not smoke marijuana himself, these friends and

acquaintances, knowing of respondent's interest in private aviation, occasionally suggested to respondent that he put them in touch with any pilot who would be willing to fly marijuana from Mexico.

In response to Bagley's requirement for financial assistance, respondent told him of these friends and their request. Respondent apparently entertained immediate second thoughts about this reference, but Bagley during the following week constantly urged respondent to complete the reference, citing his urgent need for funds. Respondent finally agreed to sponsor a meeting in his office between Bagley and these persons. At that meeting Bagley and the friends conceived of a tentative plan to smuggle marijuana into the United States. Respondent himself, however, after introducing the parties, left the meeting and did not assist in formulating the plan.

Immediately after this meeting Bagley called the United States Customs Service. He represented to the federal officers that an old friend had just contacted him and requested that he assist in smuggling marijuana. Evidently the bounty offered by the Customs Service for assistance in apprehending smugglers motivated Bagley; indeed, Bagley had similarly betrayed another "friend" four or five years previously, collecting a substantial sum for his performance as informer. As a result of Bagley's call in the instant case, the Customs Service provided him with a recorder with which to record all future conversations with respondent.

Over the next three months Bagley and respondent's friends worked toward fruition of the smuggling plan. Although respondent himself expressed his desire not to participate, Bagley succeeded in preserving respondent's involvement in the scheme up to the moment of its attempted completion. In order to maintain respondent's role in the conspiracy Bagley asserted his urgent requirements for money, his distrust of respondent's friends, and his need for the protection that could only come from respondent's participation in the conspiracy's transactions.

Respondent succumbed in part to Bagley's pleadings, and on one occasion lent Bagley $75 so that Bagley could reestablish his pilot qualifications, and in another instance delivered $1,000 of his friends' money to Bagley. The $75 represented a personal loan from respondent and not part of Bagley's fee from the conspirators; the $1,000 did form part of Bagley's fee.

In November Bagley and respondent's friends attempted to execute the smuggling plan. Bagley flew to Guadalajara, where one of the confederates waited with the marijuana. Although, when Bagley arrived, the Mexican Federales arrested him and his confederate, the American customs officials persuaded the Mexican authorities to release him. The au-

thorities substituted alfalfa for the marijuana; Bagley returned to California with that substituted product, and upon his arrival in Palm Springs the American customs officials arrested the waiting confederate to whom Bagley was to deliver the marijuana.

The next day federal agents arrested respondent in his office. Respondent freely described his role in the plan, admitted the wrongfulness of his actions, and offered to cooperate in whatever way possible. He refused, however, to concede that his motivation was for any personal gain, consistently contending that his sole purpose was to assist Bagley in overcoming his financial difficulties.

In late November of 1968 a federal grand jury indicted respondent for conspiracy to smuggle marijuana with intent to defraud the United States, a violation of section 176a of title 21, United States Code.[1]

By May of 1969 respondent and the United States Attorney agreed that the government would dismiss the section 176a indictment if respondent would plead guilty to a charge of violating section 4744(a) of title 26, United States Code:[2] failure to pay the federal marijuana transfer tax. Respondent agreed to this plea bargain for two reasons: to

---

[1]Section 176a provided, in relevant part: "Notwithstanding any other provision of law, whoever, knowingly, with intent to defraud the United States, imports or brings into the United States marihuana contrary to law, or smuggles or clandestinely introduces into the United States marihuana which should have been invoiced, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such marihuana after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or whoever conspires to do any of the foregoing acts, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000. . . ."

Congress repealed this section on October 27, 1970. (See Pub. Law 91-513, § 1101 (a)(2), 84 Stat. 1291.) The importation of marijuana is now proscribed by 21 United States Code section 952, with a penalty under 21 United States Code section 960(b)(2) of five years' imprisonment and a $15,000 fine.

[2]Section 4744(a) provided, in relevant part, "It shall be unlawful for any person who is a transferee required to pay the [marijuana] transfer tax . . .

"(1) to acquire or otherwise obtain any marihuana without having paid such tax, or

"(2) to transport or conceal, or in any manner facilitate the transportation or concealment of any marihuana so acquired or obtained."

Under 26 United States Code section 7237(a), punishment for violation of section 4744 consisted of imprisonment for a term from two to ten years, and a fine of not more than $20,000. First offenders could receive suspended sentences.

Congress repealed both these sections on October 27, 1970. (See Pub. Law 91-513, §§ 1101(b)(3)(A), 1101(b)(4)(A), 84 Stat. 1292.) The possession of marijuana for distribution is now proscribed by 21 United States Code section 841(a)(1), and the penalty for first offenders under 21 United States Code section 841(b)(2) is a maximum of five years' imprisonment and a $15,000 fine, with no minimum punishment.

avoid the possibility of the mandatory five-year sentence that would result from a conviction on the section 176a charge, and to avoid the publicity and delay that would attend a trial on that charge. The United States Attorney's motivation to reduce the charge apparently derived from the difficulty in proving respondent's fraudulent intent and from the possible success of respondent's establishing a defense of entrapment.[3]

On June 16, 1969, the federal district court found respondent guilty of violation of the above-mentioned section 4744,[4] and sentenced him to a three-year probation, the first 90 days of which were to be served in jail. At the sentencing the federal judge found that respondent's "motives were good, though they may have been misconceived or misplaced." The judge also condemned Bagley's role in encouraging respondent's participation in the smuggling scheme.

Respondent served his term and became an exemplary probationer. His probation officer reported that respondent cooperated fully in all aspects of his rehabilitation and demonstrated his ability to represent his clients creditably. The probation officer also expressed his view that respondent had suffered enough for his errors, and did not require further discipline.

On April 21, 1970, the State Bar transmitted respondent's record of conviction to this court, as authorized by Business and Professions Code section 6101. In response to our request for briefs on the question of whether conviction of a violation of section 4744 involved moral turpitude, the State Bar asserted that failure to pay the marijuana transfer tax did *not* involve moral turpitude per se. Nonetheless, the bar requested an evidentiary hearing to determine if the nature of respondent's conduct did

---

[3]Respondent could demonstrate on the stipulated facts that without Bagley's persistent demands the conspiracy would not have reached fruition, or an least that respondent would not have formed part of the conspiracy that eventually matured. These showings may have constituted a valid entrapment defense to the section 4744 charge. (See *Sendejas* v. *United States* (9th Cir. 1970) 428 F.2d 1040; *United States* v. *Dehar* (2d Cir. 1968) 388 F.2d 430; *Guerra* v. *United States* (10th Cir. 1966) 371 F.2d 584.)

[4]On May 19, 1969, between the time of respondent's plea and conviction, the United States Supreme Court decided *Leary* v. *United States* (1969) 395 U.S. 6 [23 L.Ed.2d 57, 89 S.Ct. 1532], holding that invocation of the self-incrimination clause would constitute a complete defense to 26 United States Code section 4744(a). Since respondent could have withdrawn his guilty plea any time before sentencing (Fed. R. Crim. P., rule 34(d)) he had available on the date of his conviction a complete defense to the charge to which he pleaded guilty. Respondent also had available another defense, namely, that he never acted as a transferee of marijuana, and hence was not obligated to pay the tax. (See *Symons* v. *United States* (9th Cir. 1949) 178 F.2d 615.) Despite the "conclusive evidence" of respondent's guilt that follows from his guilty plea (Bus. & Prof. Code, § 6101), the presence of valid defenses is relevant in mitigation of the discipline to be imposed on respondent, as will be shown *infra.*

introduce an element of moral turpitude into the offense of which he was convicted. On June 17, 1970, pursuant to Business and Professions Code section 6102, subdivision (c), we complied with this request and referred respondent's case to the bar for hearing and recommendation.

The local bar administrative committee heard this matter on November 2, 1970, finding that respondent conspired to smuggle marijuana "for distribution and gain," and concluding that his acts constituted moral turpitude. The committee recommended disbarment. The examiner who had presented the bar's case to this committee did not agree with these findings, specifically challenging the conclusion that respondent conspired to smuggle "for gain," and asserting that disbarment constituted an unnecessarily severe discipline. The bar disciplinary board agreed, revising the findings to conclude that respondent conspired to smuggle only "for distribution" and recommending two years actual suspension of respondent's license to practice law.

In order to support a disbarment or suspension from the practice of law, the attorney must have committed a crime involving moral turpitude (Bus. & Prof. Code, § 6101) or an act involving "moral turpitude, dishonesty, or corruption." (Bus. & Prof. Code, § 6106.) ■ Although the burden falls on each respondent to show that the disciplinary board's findings of moral turpitude are not supported by the evidence (*Lee* v. *State Bar* (1970) 2 Cal.3d 927, 939 [88 Cal.Rptr. 361, 472 P.2d 449]), such findings do not bind this court. ■ The question of moral turpitude is one of law; the determination of the issue becomes this court's responsibility. (*In re Alkow* (1966) 64 Cal.2d 838 [51 Cal.Rptr. 912, 415 P.2d 800, 21 A.L.R. 3d 882]; *Grove* v. *State Bar* (1965) 63 Cal.2d 312, 315 [46 Cal.Rptr. 513, 405 P.2d 553].) ■ In reaching our conclusion as to whether a specific crime or act constitutes moral turpitude, we are bound to resolve all doubts in favor of the accused respondent. (*Himmel* v. *State Bar* (1971) 4 Cal.3d 786 [94 Cal.Rptr. 825, 484 P.2d 993]; *Lee* v. *State Bar, supra,* at p. 939.)

"Moral turpitude" is an elusive concept incapable of precise general definition. One dramatic exposition of the term was rendered by this court in 1938, and has since been consistently followed: "an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellowmen, or to society in general, contrary to the accepted and customary rule of right and duty between man and man." (*In re Craig* (1938) 12 Cal.2d 93, 97 [82 P.2d 442]; see also *Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 73 [64 Cal.Rptr. 785, 435 P.2d 553]; *In re Boyd* (1957) 48 Cal.2d 69, 70 [307 P.2d 625].) Moral turpitude has also been described as any crime or misconduct committed without excuse (*In re Hallinan* (1954) 43 Cal.2d 243, 251 [272 P.2d 768]; *In re*

*Rothrock* (1940) 16 Cal.2d 449, 453 [106 P.2d 907, 131 A.L.R. 226]), or as any "dishonest or immoral" act, not necessarily a crime. (1 Witkin, Cal. Procedure (2d ed. 1970) Attorneys, § 195, at p. 202.) " 'The concept of moral turpitude depends upon the state of public morals, and may vary according to the community or the times,' " (see *In re Hatch* (1937) 10 Cal.2d 147, 151 [73 P.2d 885]), as well as on the degree of public harm produced by the act in question.

■ In evaluating conduct that may or may not involve moral turpitude, we must recognize the purpose for which we have established the "moral turpitude" standard: to ensure that the public, the courts, and the profession are protected against unsuitable legal practitioners. (See *Hallinan* v. *Committee of Bar Examiners* (1966) 65 Cal.2d 447, 471-472 [55 Cal.Rptr. 228, 421 P.2d 76]; *In re Rothrock, supra,* 16 Cal.2d at p. 454; cf. *Yakov* v. *Board of Medical Examiners, supra,* 68 Cal.2d at p. 73 and fn. 6 (medical doctor).) The objective is not to impose punishment upon members of the profession. ■ To hold that an act of a practitioner constitutes moral turpitude is to characterize him as unsuitable to practice law.

We turn first to the question of whether moral turpitude, as above described, can be imputed per se from the respondent's conviction of failure to pay the marijuana transfer tax. ■ In bar discipline proceedings under section 6101 of the Business and Professions Code, the respondent's conviction of an offense stands as conclusive proof that the accused committed all acts necessary to constitute the offense. (*In re Hallinan, supra,* 43 Cal.2d at p. 247.) Because in the instant case the offense violates federal law, we look to the federal courts to determine the nature of the elements of a conviction under section 4744(a), title 26, United States Code. (*In re Hallinan, supra,* at p. 250.)

Section 4744(a)(1) declared, in part, prior to its repeal in 1970,[5] "It shall be unlawful for any person who is a transferee required to pay the [marijuana] transfer tax . . . to acquire or otherwise obtain any marijuana without having paid such tax." That the principal element of the offense is failure to pay the tax becomes clear in view of the Supreme Court's recent discussion of section 4744(a) in the case of *Leary* v. *United States* (1969) 395 U.S. 6 [23 L.Ed.2d 57, 89 S.Ct. 1532]. In *Leary* the court evaluated the legislative history of section 4744 and concluded that its purpose was "merely to impose a very high tax on transfers to [non-medical marijuana users and carriers] and not to prohibit such transfers entirely." (395 U.S. at p. 21 [23 L.Ed.2d at p. 73].) Thus, because the statute contains no requirement of wrongful intent or intent

---

[5]See footnote 2, *supra.*

to defraud the government, an individual may be convicted under section 4744(a) by virtue of his possession of marijuana and his failure, however inadvertent, to pay the tax.

■ We cannot hold that a violation of section 4744(a) constitutes moral turpitude in every case. In the first place, as we have explained, the statute does not require an intent to defraud, and without such intent the failure to pay a tax does not involve moral turpitude. (See *In re Hallinan, supra,* 43 Cal.2d at pp. 252-254.) Furthermore, although the act condemns the illegal acquisition of marijuana, the possession and use of marijuana at the present time raises controversial questions, to which automatic answers cannot be given. Lawmakers, legal scholars, physicians, and sociologists are divided in opinion as to the wisdom of prohibiting or punishing these acts.[6] In response to demands from sources of the highest integrity that marijuana be treated differently from other drugs, and that punishments for its use be eliminated or significantly ameliorated,[7] the Congress in 1970 reduced the crime of unlawful possession or unremunerated distribution of marijuana from felony to misdemeanor status, providing for the probation and eventual expunging of records of those who are first offenders. (See 21 U.S.C. § § 841(b)(4), 844.) The California Legislature had in 1968 similarly responded, reducing the crime of first offense marijuana possession from a felony to a felony-misdemeanor, and providing for incarceration in county jails rather than the state prisons. (Health & Saf. Code, § 11530.)

The State Bar states in its brief: "If Section 4744(a) is viewed from the nature of the activities it seeks to discourage (i.e., smoking marihuana, addiction to it, or its use for illicit traffic), with the differing social views extant today it would appear that only the latter activity (use for illicit traffic) could be defined as an act 'done contrary to practice, honesty, modesty, or good morals' and 'an act of baseness, vileness or depravity' necessarily involving moral turpitude. [Citations.] From the information it cannot be determined whether Mr. Higbie acquired and obtained the marihuana as a smoker, addict or for illicit traffic in marihuana. ¶ It does

[6]See Marihuana: First Report by the Select Committee on Crime, House Report No. 91-978, 91st Congress, 2d Session (1970) at pages 95-106; Clark, Crime in America (1970) at pages 95-96; Kaplan, Marijuana—The New Prohibition (1970); The New Social Drug: Cultural, Medical, and Legal Prospectives on Marijuana (Smith ed. 1970) at pages 106-156; Kaplan, *Foreword: Marijuana Laws: An Empirical Study of Enforcement and Administration in Los Angeles County* (1968) 15 U.C.L.A. L. Rev. 1499, 1501-1506.

[7]See e.g., House Report 91-978, *supra*; Kaplan, Marijuana—The New Prohibition, *supra;* Arthur D. Little, Inc., Drug Abuse and Law Enforcement (1967) at pages 14-17, 100; President's Advisory Committee on Narcotic and Drug Abuse, Final Report (1963) at pages 39-43.

not appear that Mr. Higbie's conviction is one involving moral turpitude as a matter of law." (Memorandum of State Bar, pp. 10-11.)

We agree. ■ Possession or use of marijuana is, of course, unlawful (see Health & Saf. Code, § 11530 et seq.), but measured by the morals of the day (*In re Hatch, supra,* 10 Cal.2d at p. 151) its possession or use does not constitute "an act of baseness, vileness, or depravity . . . contrary to the accepted and customary rule of right and duty between man and man" (*In re Craig, supra,* 12 Cal.2d at p. 97), or indicate that an attorney is unable to meet the professional and fiduciary duties of his practice.

Even though the crime for which respondent has been convicted does not constitute moral turpitude per se, we must examine the facts and circumstances that gave rise to the offense to determine whether respondent's behavior does involve moral turpitude. ■ In this investigation we are not restricted to examining the elements of the section 4744 conviction, but may look to the whole course of respondent's conduct which reflects upon his fitness to practice law. (See Bus. & Prof. Code, § 6106; *In re Hallinan, supra,* 43 Cal.2d at p. 253; *Suspension of Hickman* (1941) 18 Cal.2d 71, 74 [113 P.2d 1]; 1 Witkin, Cal. Procedure, *supra,* § 199, at p. 206.)

The Disciplinary Board of the State Bar found that respondent "engaged in a conspiracy to smuggle a large quantity of marijuana into the United States of America for the purpose of distribution." If we read this finding to mean that respondent's motivation for engaging in the conspiracy was to effect unlawful distribution of marijuana, then we must surely conclude that this behavior involved moral turpitude. The purposeful evasion of federal laws that require the reporting and taxation of imported marijuana constitutes a fraud upon the government, an act of dishonesty no more tolerable than fraud upon an individual. "Although the problem of defining moral turpitude is not without difficulty [citations], it is settled that whatever else it may mean, it includes fraud. . . ." (*In re Hallinan, supra,* 43 Cal.2d at p. 247.)

The facts surrounding respondent's case do not compel the conclusion that respondent's intent was to defraud the government, and we do not interpret the board's finding so to hold. ■ Rather, the circumstances indicate that although "distribution," and hence fraud, constituted the purpose of the conspiracy, respondent was not necessarily so motivated. The facts show that respondent neither sought any gain nor expected to enjoy any benefit from his role in the scheme; that he neither used marijuana himself nor advocated its greater use in this country. These facts lend credence to his contention that his initial action in the conspiracy,

the referral of Bagley to his friends, grew entirely out of his desire to assist Bagley with his financial problems. Although respondent became more enmeshed in the conspiracy in the weeks following his initial move, the facts indicate that this involvement either grew out of a continuing compassion for Bagley's condition in life, or resulted from Bagley's amoral efforts to win a bounty by building the government's case against respondent.

The federal district judge who sentenced respondent under his section 4744 conviction adopted this conclusion, finding that respondent's "motives were good, though they may have been misconceived or misplaced." We therefore interpret the board's finding to mean that respondent assisted a conspiracy, the aim of which was to defraud the government, but did not share the conspiracy's fraudulent purpose.

The inquiry into respondent's behavior does not end with a conclusion that his actions did not constitute fraud. ▇▇ Fraud is but one, even if a principal, facet of moral turpitude. Respondent purposefully disregarded legal standards of conduct in his advice to Bagley, and invited his friend to place himself in jeopardy of the law and to engage in an unlawful conspiracy. ▇▇ Respondent failed to sever himself from that scheme when, on reflection, both conscience and the law so demanded. Moreover, respondent disregarded the legitimate interest and concern of the public that attorneys not use their legal knowledge to counsel and assist clients to violate the law.

Because respondent's actions indicate his failure in the "private and social duties" that, as an attorney, he owed to Bagley and to the public at large (*In re Craig, supra,* 12 Cal.2d at p. 97), as well as his unsuitability to be entrusted with the privileges and duties of the legal profession, these actions involve moral turpitude.

Although the respondent's conduct calls for discipline to protect both the profession and the public, we note the following factors that mitigate against respondent's disbarment or suspension. He had no disciplinary record prior to the instant case. (Cf. *In re Jones* (1971) 5 Cal.3d 390, 401 [96 Cal.Rptr. 448, 487 P.2d 1016]; *Simmons* v. *State Bar* (1969) 70 Cal. 2d 361, 366 [74 Cal.Rptr. 915, 450 P.2d 291].) He enjoyed a good reputation among his clientele and the members of his community, even after the events of his participation in the smuggling scheme came to light. (Cf. *In re Jones, supra.*) He has continued to practice law following his incarceration, and has successfully represented his clients' interests and obtained their trust. (Cf. *id.*) His wrongful actions did not grow out of a motive of personal enrichment, but were prompted almost entirely by the malevolent invitations of an informer. (Cf. *Yakov* v. *Board of Medical*

*Examiners, supra,* 68 Cal.2d at p. 71; *In re Clark* (1959) 52 Cal.2d 322, 324 [340 P.2d 613].) Nor did his actions cause any particular individual to suffer physical or financial harm. (Cf. *Himmel* v. *State Bar, supra,* 4 Cal.3d at p. 798; *Sullivan* v. *State Bar* (1955) 45 Cal.2d 112, 119-120 [287 P.2d 778]; cf. *In re Jones, supra,* 5 Cal.3d at p. 400.)

Furthermore, respondent displayed honesty and cooperation when confronted with arrest, and in foregoing possibly meritorious defenses to both the conspiracy and tax evasion charges, indicated recognition of his wrongful conduct and willingness to rehabilitate himself. (Cf. *In re Plotner* (1971) 5 Cal.3d 714, 716-717 [97 Cal.Rptr. 193, 488 P.2d 385]; *Simmons* v. *State Bar, supra,* 70 Cal.2d at p. 368; *In re Alkow, supra,* 64 Cal.2d at p. 841.)

 Viewing respondent's wrongful conduct in light of these mitigating factors, we conclude that the protection of the public, the courts, and the legal profession do not require that he be disbarred but that he should be suspended for a two-year term as specified below.

We order that Richard Alden Higbie be suspended from the practice of law for two years, the first year of which shall be actual suspension. Following actual suspension, he shall be placed on probation for the last year of the two-year term, during which period he may engage in the practice of law. If during the term of his actual suspension and probation no misconduct of his is called to the attention of this court, then, without further order his probation and suspension shall terminate and he shall be reinstated as an attorney with full status in the bar.

This order shall become effective 30 days after the filing of this opinion.