[No. S007477. Dec. 18, 1989.]

In re PAULINO ALMANDO AQUINO on Disbarment.

1124

**COUNSEL**

David A. Clare for Petitioner.

Diane C. Yu and Truitt A. Richey, Jr., for Respondent.

## OPINION

**THE COURT.**—We review the recommendation of the Review Department of the State Bar Court that petitioner Paulino Almando Aquino be disbarred. The recommendation stems from petitioner's conviction on multiple counts of violating federal immigration and naturalization laws by engaging in a fraudulent scheme to aid citizens of the Philippines to obtain permanent resident status in the United States. Petitioner asserts the review department's findings erroneously ignore evidence his involvement in the scheme was aberrant, he is remorseful, and he has been rehabilitated. He also contends disbarment is disproportionately severe as compared to the discipline imposed on other attorneys for similar or more egregious behavior.

We agree with petitioner that the hearing officer and the review department should have considered several mitigating factors. Taking those factors into consideration, we nonetheless conclude that disbarment is warranted.

### I. *Facts*

Petitioner was born in the Philippines and was admitted to the Philippine Bar in 1963. Between 1969 and 1976, he was twice elected to the office of municipal counselor, the equivalent of a city councilman. He immigrated to the United States in 1976, working as a paralegal, workers' compensation investigator, and regional manager of a life insurance company before being admitted to the California Bar in May 1979.

Thereafter, petitioner began a solo practice, handling immigration, family law, personal injury, and bankruptcy matters. He also continued in his managerial capacity for the insurance company. As of October 1980, he employed two people: Jose Caringal, an attorney from the Philippines who worked as a paralegal, and Amelia Sifra, a secretary.

### 1. *The Sham Marriage Scheme*

Between October 1980 and June 1981, petitioner engaged in a fraudulent scheme aimed at obtaining permanent resident status for citizens of the Philippines. Petitioner and the State Bar stipulated to the following facts concerning petitioner's involvement in that scheme.

#### a. *The Sy Matter*

In October 1980, petitioner was hired for $800 by Alice Sy, a citizen of the Philippines, to assist her in obtaining a United States resident visa for

which she did not qualify.[1] Petitioner referred her to Caringal, petitioner's paralegal. Petitioner subsequently became aware that Caringal had arranged for Sy to marry Stephen Bauman, a United States citizen. Petitioner and Caringal split the fee payable to petitioner's office. In addition, petitioner received a "gratuity" of $15 from the minister who performed the marriage for a fee of $100.

After the marriage, Caringal assisted Sy in filling out Immigration and Naturalization Service (I.N.S.) forms I-130E (Petition to Classify the Status of an Alien Relative for the Issuance of an Immigrant Visa), and I-485H (Application for Status as Permanent Resident). Petitioner filed the forms with the I.N.S. Petitioner also gave Sy a list of questions that would be asked at her I.N.S. interview and advised her to compose consistently false answers to the I.N.S. regarding her marriage to Bauman. Neither Sy nor Bauman went to the I.N.S. interview. Finally, when Sy told him she would not be living with Bauman, petitioner instructed her to obtain identification showing her name as Bauman and Bauman's address as her residence.

### b. The Foliente Matter

In January 1981, petitioner was hired for $500 by Calvin Foliente, a citizen of the Philippines, and his wife Emma Foliente, to assist Calvin in obtaining a United States resident visa for which he did not qualify. Calvin's cousin, Ray Foliente, had arranged a sham marriage between Calvin and Glenda Taber, a United States citizen. Petitioner met with Calvin, Emma and Glenda, and helped them fill out I.N.S. forms I-130E and I-485H. At that time, petitioner became aware that the purported marriage of Calvin and Glenda was arranged to create the status of resident alien for Calvin. Petitioner subsequently filed the forms with the I.N.S., requesting permanent resident status for Calvin on the basis of his marriage to Glenda. Petitioner met with the parties again, and advised them to postpone a pending I.N.S. interview until after the impending birth of Glenda's child, so that the child would have Calvin's name.

### c. The Conferido Matter

In March 1981, petitioner was paid $300 by Daniel Conferido, a citizen of the Philippines, and his wife Lilia Conferido, to assist Daniel in obtaining a United States resident visa for which he did not qualify. Petitioner learned Ray Foliente had arranged a sham marriage between Daniel, whose wife

---

[1] Neither the stipulation of facts nor the hearing testimony reveals the precise point in time when petitioner became aware that Sy, as well as the other clients discussed hereafter, did not qualify for a United States resident visa.

was a citizen of the Philippines, and Cheryl Mitchell, a United States citizen. Petitioner met with Daniel and Cheryl, helped them fill out I.N.S. forms I-130E and I-485H requesting permanent resident status for Daniel, and filed the forms with the I.N.S. He also instructed Daniel and Cheryl to act as if they were a married couple when they were interviewed by the I.N.S., and provided them a list of possible interview questions and suggested answers.

### d. *The Estrada Matter*

Also in March 1981, petitioner was hired for $600 by Francisco Estrada, a citizen of the Philippines, for assistance in obtaining a United States resident visa for which Estrada did not qualify. Petitioner became aware that a third party had arranged a sham marriage between Estrada and Helen Mason, a United States citizen.

Petitioner knowingly accepted and transmitted to the I.N.S. a falsified death certificate indicating that Estrada's wife, a citizen of the Philippines, was deceased. In addition, Caringal prepared I.N.S. forms I-130E and I-485H with petitioner's knowledge and, with the assent of petitioner, falsely attested that the signatories had sworn to the contents therein. Petitioner then submitted the forms to the I.N.S.

### e. *The Ordonez Matter*

Petitioner also was hired in March 1981 by Jaime Ordonez, a citizen of the Philippines, for assistance in obtaining a United States resident visa for which Ordonez did not qualify. As in the Estrada matter, petitioner became aware that a third party had arranged a sham marriage between Ordonez and Noemi Alaniz, a United States citizen. Ordonez and Alaniz signed blank immigration forms I-130E and I-485H, which were completed by Caringal and submitted to the I.N.S. by petitioner. Petitioner counseled the parties to respond falsely to I.N.S. questions regarding their marriage.

### 2. *Federal Conviction*

In October 1983, petitioner was charged in three separate federal grand jury indictments arising from the conduct described above. In November 1984, petitioner was convicted by a jury on three counts of violating 18 United States Code section 371 (conspiracy), two counts of violating 18 United States Code sections 1015 and 2(b) (aiding, abetting, counseling, inducing or procuring the knowingly false notarization of I.N.S. forms), and eight counts of violating 18 United States Code sections 1001 and 2(a)

(causing a false statement to be made and submitted to the I.N.S.).[2] He was sentenced to three concurrent two- and one-half-year terms of imprisonment and a five-year period of probation thereafter.

On appeal, the United States Court of Appeals for the Ninth Circuit affirmed petitioner's conviction on all but one count (false acknowledgement of document relating to the Estrada-Mason marriage), on which it reversed the conviction and suspended sentence for insufficiency of evidence. (*United States* v. *Aquino* (9th Cir. 1986) 802 F.2d 466.)

Petitioner served approximately one year in federal prison, obtaining early release in February 1986 for good behavior. After his release, he spent four months at a halfway house, completing four hundred hours of community service.

### 3. *Disciplinary Proceedings*

Following petitioner's conviction, this court ordered him suspended from the practice of law effective May 3, 1985. We further ordered that he comply with rule 955 of the California Rules of Court (hereafter rule 955).

In June 1987, after petitioner's conviction became final, we referred the matter to the State Bar for a hearing, report, and recommendation as to whether petitioner's actions involved moral turpitude or other misconduct warranting discipline and, if so, what discipline should be imposed. Petitioner stipulated that the facts and circumstances surrounding his conviction involved moral turpitude. He also stipulated that by his conduct he willfully violated his oath and duties as an attorney pursuant to Business and Professions Code section 6068, subdivision (a), as proscribed by Business and Professions Code section 6103, and Rules of Professional Conduct, former rule 7-101.

Following a two-day hearing, the hearing officer found that petitioner had no prior disciplinary record with the State Bar, he continued to view himself "as a victim of circumstances," and the evidence presented at the hearing showed no mitigating factors that might explain petitioner's conduct, and no proof that petitioner had been rehabilitated. The hearing officer recommended that petitioner be disbarred. He also recommended that petitioner be ordered to comply with rule 955 and be allowed to peti-

---

[2] The stipulation between petitioner and the State Bar and the bar's brief each state that petitioner was convicted on nine counts of violating United States Code, title 18, sections 1001 and 2(a). The indictments show petitioner was charged with only eight counts, and the sentencing documents reveal that he was convicted on all eight counts.

tion for reinstatement "after a period of three years following the effective date of the final Order of the Supreme Court."

The review department, by a 10-to-4 vote, adopted the stipulation of facts and the hearing officer's findings that the evidence presented at the hearing demonstrated neither mitigating factors nor rehabilitation. By a nine-to-five vote, the review department recommended that petitioner be disbarred. Four of the dissenting votes were cast "on the ground that the degree of discipline recommended is excessive in light of the Supreme Court's decision in *Matter of Sparrow* (1985) Bar Misc. No. 4639, considering that [petitioner's] acts occurred more than seven years ago, and in view of [petitioner's] showing of remorse and prolonged period of rehabilitation without further misconduct." The review department recommended that we not order compliance with rule 955 because we had imposed that requirement in connection with petitioner's interim suspension. Finally, the review department noted that, pursuant to Rules of Procedure of the State Bar, rule 662, if petitioner is disbarred he "will be permitted to petition for reinstatement as a matter of right on May 3, 1990, five years from the date his current interim suspension became effective."

## II. *Discussion*

■ The sole issue before us is the degree of discipline to be imposed. The purpose of disciplinary proceedings is to protect the public, the courts, and the integrity of the legal profession. (*Tarver* v. *State Bar* (1984) 37 Cal.3d 122, 133 [207 Cal.Rptr. 302, 688 P.2d 911].) ■ In determining the appropriate discipline, we exercise our independent judgment. (*In re Basinger* (1988) 45 Cal.3d 1348, 1358 [249 Cal.Rptr. 110, 756 P.2d 833]; *Greenbaum* v. *State Bar* (1987) 43 Cal.3d 543, 550 [237 Cal.Rptr. 168, 736 P.2d 754].) We examine the facts of each case, considering not only the gravity of the misconduct but also any mitigating or aggravating factors. (*Tarver, supra,* 37 Cal.3d at p. 133.) We accord great weight, however, to the recommendation of the review department (*ibid.*), and petitioner bears the burden of proving that the recommendation is erroneous or unlawful (*In re Vaughn* (1985) 38 Cal.3d 614, 618 [213 Cal.Rptr. 583, 698 P.2d 651]).

In this case, the State Bar presented no evidence of aggravating factors. ■ Petitioner asserts the recommendation of disbarment fails to give sufficient weight to "substantial mitigating circumstances" and is disproportionate to his offenses. Although petitioner demonstrates some mitigating factors, we conclude disbarment is warranted.

An attorney may be disbarred or suspended on the basis of his or her conviction of a crime involving moral turpitude. (Bus. & Prof. Code,

§ 6101, subd. (a).) Petitioner has been convicted of several crimes, each of which involves intentional dishonesty and fraudulent conduct. As petitioner stipulates, these crimes involve moral turpitude. They are sufficiently egregious to justify disbarment. Knowingly countenancing perjury is conduct "unworthy of the office of attorney." (*In re Allen* (1959) 52 Cal.2d 762, 768 [344 P.2d 609].) Petitioner has not only countenanced perjury; he affirmatively and repeatedly counseled his clients to perjure themselves before the I.N.S. Such conduct clearly warrants disbarment.

### 1. *Mitigating Evidence*

Petitioner maintains that the hearing officer's findings with respect to mitigation were against the weight of the evidence. In particular, he contends (1) the hearing officer considered the testimony of only three of petitioner's seven witnesses; (2) the hearing officer failed to consider petitioner's good conduct since ending his participation in the sham marriage scheme; (3) the evidence discloses mitigating factors that explain the acts for which petitioner was convicted; and (4) the hearing officer erred in concluding that petitioner had not shown true remorse for his conduct.

■ Although we afford great weight to the findings of the State Bar Court, it is our duty to examine the record independently, weigh the evidence, and pass on its sufficiency. (*In re Strick* (1983) 34 Cal.3d 891, 900 [196 Cal.Rptr. 509, 671 P.2d 1251], opn. after remand (1987) 43 Cal.3d 644 [238 Cal.Rptr. 397, 738 P.2d 743].) In doing so, we resolve all reasonable doubts in favor of petitioner. (*Ibid.*) Petitioner, however, bears the burden of demonstrating that the findings "are not sustained by convincing proof and to a reasonable certainty." (*Ibid.*) With these principles in mind, we consider petitioner's four contentions.

### a. *Testimony of Character Witnesses*

■ Petitioner presented testimony of seven witnesses, including a municipal court judge, two attorneys, and a psychologist. The witnesses generally attested to petitioner's honesty and good character. Two witnesses noted that petitioner presently engages in fewer social activities, is more devoted to his family and is more involved in religion than during the period of the sham marriage schemes. Petitioner also offered 20 letters from various members of the community affirming his good character. Petitioner's professional and personal acquaintances' confidence in his character and his rehabilitation may be considered in mitigation. (*In re Dedman* (1976) 17 Cal.3d 229, 234 [130 Cal.Rptr. 504, 550 P.2d 1040]; *Demain* v. *State Bar* (1970) 3 Cal.3d 381, 388 [90 Cal.Rptr. 420, 475 P.2d 652].) The findings by the hearing officer incorrectly state that the "evidence presented

at the hearing consists of the testimony of one judge and two attorneys as character witnesses."[3] We assume arguendo that the hearing officer and review department erroneously failed to consider the testimony of the other witnesses and the contents of the 20 letters. Nevertheless, we are not convinced such evidence is significant in mitigation because our review reveals that most of those who testified or wrote in support of petitioner's character may not have been familiar with the details of his misconduct. (See Rules Proc. of State Bar, div. V, Stds. for Atty. Sanctions for Prof. Misconduct, std. 1.2 (e)(vi) [mitigating circumstances include "an extraordinary demonstration of good character of the member attested to by a wide range of references in the legal and general communities and who are aware of the full extent of the member's misconduct"].)

### b. *Petitioner's Subsequent Good Conduct*

After petitioner's acts of misconduct ended in June 1981, petitioner practiced law without further misconduct for three and one-half years. His work has included pro bono services to the profession and community. ■ Evidence of continued practice without further ethical violations may be considered in mitigation. (*Bradpiece* v. *State Bar* (1974) 10 Cal.3d 742, 747 [111 Cal.Rptr. 905, 518 P.2d 337]; *In re Higbie* (1972) 6 Cal.3d 562, 573 [99 Cal.Rptr. 865, 493 P.2d 97].)

Soon after petitioner was convicted, and before the State Bar initiated disciplinary proceedings, he voluntarily ceased practicing law and notified his clients and the State Bar of his conviction and his withdrawal from practice. Moreover, he subsequently stipulated to the facts of his misconduct. ■ Cooperation with the State Bar is a mitigating factor. (*Bradpiece, supra,* 10 Cal.3d at p. 748.)

Petitioner has worked as a paralegal for another attorney since autumn 1986. That attorney expressed confidence in petitioner's abilities, and a belief that petitioner is rehabilitated. ■ The confidence of fellow attorneys and employers may be considered in mitigation. (*In re Demergian* (1989) 48 Cal.3d 284, 297 [256 Cal.Rptr. 392, 768 P.2d 1069]; *Bradpiece, supra,* 10 Cal.3d at p. 746.)

### c. *Factors Explaining Petitioner's Misconduct*

■ Both the hearing officer and the review department found petitioner demonstrated no mitigating factors explaining his conduct. Petitioner responds that the "overwhelming weight of the evidence" indicates he became

---

[3] The review department's findings did not refer to the testimony of particular witnesses.

involved in the sham marriage scheme out of misplaced sympathy for his fellow Filipino immigrants. The "overwhelming evidence" to which petitioner points appears to be nothing more than his own testimony to that effect before the hearing officer. Petitioner fails to mention that he also blamed his misconduct on inexperience, a busy social schedule, "and principally . . . the people surrounding [him]." Although petitioner contends that he neither sought nor obtained pecuniary benefit from his involvement in the scheme—he charged his "normal modest fees"—he engaged in the scheme as part of his practice of law, which presumably was for profit. The fact that petitioner would allow sympathy to lead him into repeated serious violations of federal law and of his oath as an attorney is not a mitigating factor. Rather, it manifests a defect of judgment that is cause for grave concern in one who aspires to the calling of the law. Thus, we agree with the findings by the hearing officer and review department.

### d. Petitioner's Remorse

 Finally, petitioner contends the hearing officer erred in concluding that petitioner had not accepted responsibility for his misconduct and was not genuinely remorseful. Petitioner offers several indicators that his remorse is genuine. For example, soon after his conviction, petitioner placed an advertisement in the Philippine-American Free Press, a local newspaper, stating that he had ceased practicing law because of his conviction. The advertisement also stated that petitioner was "very sorry" for the shame his conviction had brought on his family and community, and that he was "equally sorry for the embarrassment that this verdict may have brought on the legal profession." Petitioner also points to his own testimony to the effect that he "truly regret[s] what [he] did." Finally, petitioner's psychologist testified that although petitioner initially viewed himself as a victim of circumstances, during the course of treatment he came to accept responsibility for his conduct.

We find the evidence of petitioner's remorse inconclusive at best. According to petitioner, the hearing officer misinterpreted the testimony of Municipal Court Judge Mel Recana as evidence that petitioner views himself as a victim of circumstances. Judge Recana testified that petitioner "accept[ed] the verdict of the jury [but] he said that he feels that he is innocent as far as having done some of the acts." Although in our view Judge Recana's testimony is insufficient to foreclose the possibility that petitioner has accepted responsibility for his acts, the evidence as a whole raises serious doubts about whether, when, and to what extent petitioner has come to grips with his culpability. For example, although petitioner points to the January 1985 advertisement in the Philippine-American Free Press as evidence of his remorse, his psychologist's testimony established that as late as December

1986—five and one-half years after petitioner's misconduct, and two years after his conviction—he was "reluctant to acknowledge that he had been really at fault." Indeed, petitioner himself testified that his conduct was "largely influenced" by his employees, Caringal and Sifra, and that he was involved in illegal activities "principally because of the people surrounding me." Given the uncertainty over whether petitioner has accepted his culpability in the sham marriage scheme, the hearing officer and the review department were justified in concluding that petitioner should not be considered rehabilitated.

### 2. *Appropriate Discipline*

▪ Petitioner contends the recommendation of disbarment is disproportionate to the gravity of his offenses. As we have noted, petitioner's mitigating evidence is not compelling in comparison to the seriousness of his misconduct. Petitioner attempts to demonstrate that his conduct was not as egregious as that of other attorneys who have received lesser discipline. In particular, petitioner points to *In the Matter of Victor Howard Sparrow III,* Bar Misc. No. 4639, in which we adopted the review department's recommendation of a two-year suspension and five-year probation for an attorney who was convicted for his involvement in a sham marriage scheme.

We do not deny some similarity between the two cases, but we find them distinguishable. For example, petitioner was convicted on a total of 13 counts, whereas Sparrow was convicted on 5.[4] Although petitioner points out that Sparrow's misconduct apparently extended over a longer period (from 1980 to 1982), and involved theft and subornation of perjury, petitioner's pronounced disregard for standards of the legal profession scarcely can be considered less serious. The more important distinction between the two cases is the review department's finding that Sparrow "presented overwhelming evidence of mitigation and remorse through the testimony of witnesses and letters of recommendation."

Petitioner's pattern of serious misconduct in the course of his law practice warrants disbarment absent compelling mitigating circumstances.[5] (See

---

[4]Sparrow was convicted of violating 18 United States Code sections 371 (one count), 1001 (two counts), 1621(1), 1622 (subornation of perjury) (one count), and 641 (theft of government property) (one count).

[5]The State Bar urges us to apply Business and Professions Code section 6102, subdivision (c), which provides: "[T]he Supreme Court shall summarily disbar the attorney if the conviction is a felony under the laws of . . . the United States which meets both of the following criteria: [¶] (1) An element of the offense is the specific intent to deceive, defraud, steal, or make or suborn a false statement. [¶] (2) The offense was committed in the course of the practice of law or in any manner such that a client of the attorney was a victim." Because we

Rules Proc. of State Bar, div. V, Stds. for Atty. Sanctions for Prof. Misconduct, std. 3.2 [final conviction of crime involving moral turpitude shall result in disbarment unless "the most compelling mitigating circumstances clearly predominate"].) Our independent review reveals no such circumstances. Therefore, we adopt the recommendation of the review department and order that Paulino Almando Aquino be disbarred from the practice of law and that his name be stricken from the roll of attorneys. We also adopt the recommendation of the review department that petitioner not be required to comply with rule 955, California Rule of Court, and that petitioner be permitted to petition for reinstatement five years from the date his interim suspension became effective (see Rules Proc. of State Bar, rule 662). This order is effective on finality of this decision. (See Cal. Rules of Court, rule 24(a).)

KAUFMAN, J.—I concur in the order only because petitioner will be eligible to apply for reinstatement on May 3, 1990 (rule 662, Rules Proc. of State Bar) and would appear to be an excellent candidate for reinstatement at that time. Otherwise, I would favor discipline less than disbarment in this case.

Though properly acknowledging the mitigating effect of petitioner's good conduct following termination of the sham marriage scheme, the court refuses to recognize equally significant mitigation which in my view stems from petitioner's altruistic motivation for his wrongful acts. (*Ante.,* pp. 1131-1132.) I see no reason to disbelieve petitioner's testimony that he became involved in the sham marriage scheme out of misplaced sympathy for his fellow Filipino immigrants.

In each instance of wrongdoing, petitioner charged no more than his usual modest fee for an immigration matter. There is no evidence that his illegal endeavors to implement the sham marriages produced, or were intended to produce, any greater financial return than if he had rendered legitimate legal services. Moreover, as a recent immigrant from the Philippines himself, petitioner naturally tended to sympathize with others who were seeking to escape the oppressive conditions then prevailing in that land. His concerns along those lines were manifested immediately after his arrival in the United States by his extensive and continued involvement in organized efforts to assist new Filipino immigrants, send relief packages to the Philippines, and provide scholarships for Filipino students.

Though I agree with the court that petitioner's allowing his sympathy for the plight of his compatriots to lead him into the sham marriage scheme

conclude petitioner's mitigating circumstances are not compelling, we need not decide whether this provision, which became effective January 1, 1986, can be applied to summarily disbar petitioner for misconduct committed prior to that date.

"manifest[ed] a defect of judgment that is cause for grave concern in one who aspires to the calling of the law" (*ante,* p. 1132), it remains true that misconduct intended to serve altruistic ends is less culpable than if it were undertaken solely for personal aggrandizement. (*Ames* v. *State Bar* (1973) 8 Cal.3d 910, 921 [106 Cal.Rptr. 489, 506 P.2d 625]; *In re Higbie* (1972) 6 Cal.3d 562, 573 [99 Cal.Rptr. 865, 493 P.2d 97].) The mitigating effect of this altruistic motivation, together with petitioner's remorse and his prolonged period of rehabilitation, make him an excellent candidate for reinstatement to practice. Before and after his misconduct, which took place between October 1980 and June 1981, he was an exemplary practitioner, extensively involved in pro bono services to the profession and the community. In January 1985, immediately after his conviction and before any action by the State Bar, he withdrew from law practice and publicly expressed his remorse. He has voluntarily undergone psychological counselling and fully cooperated with the State Bar in these proceedings. Since release from prison in early 1986, he has worked successfully as a paralegal, completed a comprehensive course in workers' compensation law, and continued his involvement in pro bono community activities. He presented an impressive array of character witnesses.

Since petitioner will be entitled to apply for reinstatement on May 3, 1990, he is likely to be eligible to resume practice earlier by being disbarred than he would if he were suspended for a substantial period of time and placed on probation. Solely because of that fact, I concur in the order.

Mosk, J., and Broussard, J., concurred.