[S.F. No. 22906. In Bank. Feb. 13, 1973.]

In re JOHN JOSEPH FAHEY, JR., on Suspension of License.

## COUNSEL

Richard H. Foster for Petitioner.

F. LaMar Forshee, Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

## OPINION

**THE COURT.**—Respondent attorney, an active member of the State Bar, was convicted of wilfully failing to file his federal income tax returns for the years 1960, 1961 and 1962. (26 U.S.C. § 7203.) Following his conviction we referred the matter to the State Bar for a hearing, report and recommendation on whether his offense, or the circumstances surrounding its commission, involved moral turpitude and, if so, on the appropriate discipline to be imposed. (See Bus. & Prof. Code, §§ 6101, 6102; Cal. Rules of Court, rule 951(c)-(d); *In re Hallinan* (1954) 43 Cal.2d 243 [272 P.2d 768].) A special administrative committee conducted hearings and concluded that no moral turpitude was involved. The State Bar Disciplinary Board, after reviewing the record of the hearings, concluded that moral turpitude was involved and recommended that respondent be suspended from practice for three months.

■ Although respondent has the burden of showing that the disciplinary board's findings are not supported by the evidence, or that its recommendations are erroneous or unlawful, this court must exercise its independent judgment on the weight and sufficiency of the evidence (*Lee v. State Bar* (1970) 2 Cal.3d 927, 939 [88 Cal.Rptr. 361, 472 P.2d 449]) and on the legal question of moral turpitude (*In re Higbie* (1972) 6 Cal.3d 562, 569 [99 Cal.Rptr. 865, 493 P.2d 97]). ■ We must resolve all reasonable doubts in favor of the accused respondent in deciding whether

a particular crime or act involves moral turpitude. (*Himmel* v. *State Bar* (1971) 4 Cal.3d 786, 793-794 [94 Cal.Rptr. 825, 484 P.2d 993].) Our review of the record in the present case persuades us that although respondent knowingly and unlawfully failed to file the tax returns, his failure to do so was not for the purpose of personal financial gain or with intent to avoid ultimate payment of his tax obligations and that his offense did not involve acts of deception or disregard of professional standards in his practice of law. We conclude accordingly that respondent's offense and the circumstances of its commission did not involve moral turpitude within the meaning of Business and Professions Code sections 6101-6102 and that this proceeding should be dismissed.

We have before us the information and judgment of conviction in the United States District Court, the transcript of the hearing and exhibits before the administrative committee, the findings of that committee and the hearing transcript and findings of the disciplinary board. The committee exhibits include the trial transcript, findings and memorandum of decision in the criminal proceeding and the opinion affirming respondent's conviction on appeal. (*United States* v. *Fahey* (9th Cir. 1969) 411 F.2d 1213, cert. den. (1969) 396 U.S. 957 [24 L.Ed.2d 422, 90 S.Ct. 430].)

The criminal proceeding was commenced on April 13, 1967, by the filing of an information charging respondent with wilfully failing to file his income tax returns for the years 1960, 1961 and 1962 within the time required by law. He pleaded not guilty. At the nonjury trial he freely admitted that he knew he was required to file the returns and knew the criminal penalties for not doing so. He testified that he did not file the returns because of pressures arising from his practice and domestic difficulties, and because of his failure to keep adequate books and records. A psychiatrist testified that respondent's derelictions resulted from an obsessive compulsive reaction that prevented him from taking proper care of his own affairs even though he knew the nature, quality and wrongfulness of his acts.

After the receipt of all testimony the trial judge stated, "I don't think for a minute that Mr. Fahey ever had the slightest intent to cheat his government out of anything. I don't think that. That, nevertheless, is not an answer to the charges that have been made against him." In his memorandum decision the trial judge wrote that "[t]he Government has failed to establish that the defendant intended to defraud the Government of tax revenues due it," but that "such is not a requisite element of the misdemeanor defined in Section 7203. . . ." A formal finding was made that respondent knew of the criminal penalties for failure to file his tax returns

and that such failure was in each instance "a voluntary, deliberate, intentional and purposeful act on his part, and with bad purpose in that . . . the Defendant was aware that there were no reasonable or justifiable grounds for failure to timely file such tax returns." (*Id.,* at p. 1213, fn. 1.)

Respondent unsuccessfully argued on appeal from the judgment of conviction that an intent to defraud the government is a necessary element of the offense. Respondent was given concurrent sentences of one year on each of the three counts. The sentences were later reduced to four months and have been served.

The agent assigned by the Internal Revenue Service to investigate respondent's tax obligations for the years in question first conferred with respondent on December 2, 1963. The returns for 1960 and 1962 were thereafter filed on December 23, 1963, and the 1961 return was filed on April 2, 1964. There were additional years for which respondent's returns were filed late. For 1959 and some other prior years, respondent had filed his returns late and had incurred resultant penalties. His returns for the years 1963 through 1966 were not filed until March 1968. His California income tax returns for 1960 through 1966 were also filed late. When he appeared before the administrative committee on July 20, 1971, all his federal income tax returns had been filed except an estimated tax return for 1971.

Respondent's returns for the three tax years involved in his conviction were audited and showed the following amounts of tax due, exclusive of penalties and interest: $2,590.45 in 1960, $1,745.79 in 1961, $5,318.78 in 1962 (total: $9,655.02). The record contains only inexact estimates of his income for these years and of his income and tax liability for other years in which his returns were late. Before the returns for 1960, 1961 and 1962 were prepared, respondent told a special agent of the Internal Revenue Service that his income for those years "roughly grossed in excess of $30,000" for each year "on the average."[1]

All of respondent's federal income tax obligations, including penalties and interest, were paid through 1959, but for later years the record shows substantial amounts still owing. At the administrative hearing on July 20,

---

[1]Substantially lower amounts of gross income were alleged in the information that initiated the criminal proceeding: $17,676.71 in 1960, $18,403.56 in 1961 and $24,311.10 in 1962. Respondent testified that his income for these years came from his law practice and not from his investments, all of which lost money. Respondent was a sole practitioner, and it may be that in estimating his gross income at $30,000 per year, he referred to gross receipts from his practice before deduction of office overhead or other business expenses.

1971, respondent testified that he probably still owed $30,000 on his federal income. taxes for the period 1960 to 1970; that his best recollection was he had paid $1,000 on his tax liability for such period; and that he would have paid more if he had had the money to do so. In his written objections to the State Bar recommendations respondent declared that in November 1971 he entered into an arrangement with the Internal Revenue Service to pay $200 a month on his tax liability and has made the payments thus required.

Respondent has made other efforts to pay his tax obligations. At the criminal trial a special agent of the Internal Revenue Service testified that he met with respondent on December 23, 1963, at which time respondent submitted his returns for 1960 and 1962 and told the agent that he had $5,000 in his wallet, planned to borrow an additional $10,500 and would use such funds to pay his taxes. The agent advised respondent that he was not required to make payment at that time and that if he did submit a payment the money would be held in a suspense account pending completion of criminal proceedings. Respondent testified that he did not then make any payment and that his conversation with the agent caused him to refrain from doing so. At the administrative committee hearing on July 20, 1971, respondent testified that he had assigned a $25,000 promissory note to the Internal Revenue Service; that he believed the note to be collectible at the time he assigned it, but that he seriously doubted it was still collectible.

At his trial in the federal court respondent conceded that during the years 1960-1962 he invested between $9,500 and $10,000 out of current income in two business ventures, both of which lost money. This was the same time period in which his proposal to pay an immediate $5,000 in cash and another $10,500 in borrowed funds on his tax obligations was withdrawn because of the aforementioned statement by the Internal Revenue Service agent. Respondent testified at the committee hearing that there was no other time from. 1960 to 1970 during which he had the means to pay his tax obligations. ·

There is no evidence of any deficiency in respondent's discharge of his professional responsibilities to his clients. Respondent has been engaged in the practice of law, principally in criminal matters, since his admission to practice in 1931, and there is no record of any previous State Bar disciplinary proceeding against him. The psychiatrist who appeared as a witness for respondent at the federal trial testified that although respondent's psychoneurotic condition substantially impaired his ability to handle his personal financial affairs it did not affect his ability and willingness to

serve his clients. Two judges testified at the trial that respondent's professional conduct in representing clients was diligent and of high character. The disciplinary board found: "During all material times, respondent discharged his obligations to his clients in a professional manner." The administrative committee made a similar finding.

Respondent is subject to discipline only if he has committted a crime involving moral turpitude (Bus. & Prof. Code, §§ 6101-6102) or an act involving moral turpitude, dishonesty, or corruption (Bus. & Prof. Code, § 6106). Moral turpitude has been defined as "an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellowmen, or to society in general, contrary to the accepted and customary rule of right and duty between man and man." (*In re Craig* (1938) 12 Cal.2d 93, 97 [82 P.2d 442]; see also *Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 73 [64 Cal.Rptr. 785, 435 P.2d 553]; *In re Boyd* (1957) 48 Cal.2d 69, 70 [307 P.2d 625].) " ' "The concept of moral turpitude depends upon the state of public morals, and may vary according to the community or the times," ' (see *In re Hatch* (1937) 10 Cal.2d 147, 151 [73 P.2d 885]) as well as on the degree of public harm produced by the act in question." (*In re Higbie* (1972) 6 Cal.3d 562, 569-570 [99 Cal.Rptr. 865, 493 P.2d 97].) ■ The paramount purpose of the "moral turpitude" standard is not to punish practitioners but to protect the public, the courts and the profession against unsuitable practitioners. (See *Hallinan* v. *Committee of Bar Examiners* (1966) 65 Cal.2d 447, 471-472 [55 Cal.Rptr. 228, 421 P.2d 76]; *In re Rothrock* (1940) 16 Cal.2d 449, 454 [106 P.2d 807, 131 A.L.R. 226].) "To hold that an act of a practitioner constitutes moral turpitude is to characterize him as unsuitable to practice law." (*In re Higbie, supra,* 6 Cal.3d 562, 570.)

■ Conviction of some crimes establishes moral turpitude on its face. These include crimes that necessarily involve an intent to defraud or intentional dishonesty for the purpose of personal gain. (*In re Hallinan, supra,* 43 Cal.2d 243, 247-248.) They may also include particular crimes that are extremely repugnant to accepted moral standards such as murder (*In re Rothrock, supra,* 16 Cal.2d 449, 454 (dictum)) or serious sexual offenses (*In re Boyd, supra,* 48 Cal.2d 69). ■ There are other crimes the commission of which may or may not involve moral turpitude; conviction of these is not ground for discipline without additional proof of circumstances surrounding the offense. (*In re Hallinan, supra,* 43 Cal.2d 243, 249.) ■ Because respondent was convicted of a federal offense, wilful failure to file his federal income tax returns, we look to federal law to determine what elements his conviction necessarily establishes. (*In re Higbie, supra,* 6 Cal.3d 562, 570.) ■ As shown by the opinion affirm-

ing respondent's conviction on appeal, his conviction was not based on, and did not require, any intent to defraud, but rested on a finding of a "bad purpose" inferred from his voluntary, deliberate failure to file the returns with knowledge that there was no reasonable justification for his not doing so. (*United States* v. *Fahey, supra,* 411 F.2d 1213.) Such a conviction does not establish moral turpitude on its face. Thus respondent is subject to discipline only if his moral turpitude is established by special circumstances that are not necessarily present whenever the offense is committed. (*In re Higbie, supra,* 6 Cal.3d 562, 571; *In re Hallinan, supra,* 43 Cal.2d 243, 252.)

In its brief the State Bar contends that the evidence of respondent's persistence in failing to file tax returns, even for years after those for which he was prosecuted, together with his continuing failure to pay the major portion of what he owes for taxes, penalties and interest, compels a conclusion that in committing his offense he acted deliberately for the purpose of personal gain. However, such evidence is consistent with respondent's testimony that he intended at all times to file his returns eventually[2] and continually postponed doing so only because of the inadequacy of his accounts and records, the demands of his practice and the pressures of domestic difficulties.[3] ■■■ This explanation was reinforced by expert psychiatric testimony that respondent was suffering from a psychoneurotic condition that substantially impaired his ability to take proper care of his personal financial affairs.[4]

---

[2]Respondent's conviction of wilful failure to submit his tax returns "at the time or times required by law or regulations," (26 U.S.C. § 7203) did not necessarily establish any intent on his part to avoid filing the returns at any time in the future.

[3]At the administrative committee hearing, respondent described his state of mind as follows: "I am sure the testimony that I gave in the federal trial was that at no time did I have the intention, deliberately, not to file. It was a dilatory thing on my part. I had intentions to file, because I knew I had to file; but by reason of taking care of other people's affairs instead of my own, my mind was put off and put off and put off, and that is why; but there never was, at any time, any intention not to file or not to pay the taxes I owed, the same as everybody else in the country that had to pay."

[4]If an attorney commits acts of moral turpitude or other professional misconduct, the fact that his acts stem from psychiatric difficulties is no reason to refrain from disciplining him. The public should be protected from violations of professional standards regardless of the cause. (*Grove* v. *State Bar* (1967) 66 Cal.2d 680, 685 [58 Cal.Rptr. 564, 427 P.2d 164].) We consider the evidence of respondent's psychiatric problems here not as justification for acts of moral turpitude, but as tending to negate fraudulent intent, a state of mind on which a finding of moral turpitude might be based. Also distinguishable from the present case is one in which an attorney's psychological problems prevent him from properly discharging his duties to his clients. Even in the absence of moral turpitude it may be appropriate to suspend such an attorney from practice during the period of mental incompetence that prevents him from properly performing his professional duties. (*Hyland* v. *State Bar* (1963) 59

The State Bar suggests that respondent lacked candor in dealing with the agent of the Internal Revenue Service who investigated his case and in testifying before the State Bar administrative committee. ■ False testimony by an attorney on a material issue in a disciplinary proceeding against him is itself a ground for discipline. (*Barreiro* v. *State Bar* (1970) 2 Cal.3d 912 [88 Cal.Rptr. 192, 471 P.2d 992].) The record, however, does not reveal any dishonesty or any attempt to conceal the truth. Respondent's vagueness and professed lack of recollection in testifying about his personal financial matters were a probable consequence of his failure to maintain proper financial records and his delinquency in looking after his personal affairs. Inaccuracy in his oral estimates of his tax liabilities, given at his initial interview with the agent, was also not attributable to dishonesty.[5] The record shows no internal inconsistencies in respondent's statements or between his statements and other evidence, from which deception or dishonesty could be inferred. The administrative committee, which saw and heard respondent testify, made findings of fact consistent with his testimony and concluded he was free of moral turpitude in connection with his offense. ■ The fact that respondent testified before the committee gives special weight to its acceptance of his credibility. (*Medoff* v. *State Bar* (1969) 71 Cal.2d 535, 546 [78 Cal.Rptr. 696, 455 P.2d 800].) The disciplinary board, which did not see or hear respondent testify, made findings of fact that differ only in minor details from those of the administrative committee. The board's conclusion that respondent was guilty of moral turpitude appears based on a view that respondent's wilful failure to file income tax returns and the nonpayment of his income tax liability over a period of several years sufficed in itself to establish moral turpitude.

We deem the disciplinary board's conclusion to be unwarranted. ■ It is established that not only failure to file a tax return but also failure to pay a tax does not necessarily involve moral turpitude. (*In re Higbie, supra,* 6 Cal.3d 562, 571.) There must be more than mere repetition of the same acts to differentiate the offending attorney who is guilty of moral turpitude from the one who is not. No other basis is shown in

---

Cal.2d 765, 774 [31 Cal.Rptr. 329, 382 P.2d 369].) As noted in the case before us, the psychiatric witness testified that respondent's neuroses caused him to neglect only his own affairs and did not affect his ability or willingness to serve his clients.

[5] The agent testified at the trial that respondent "stated that he believed that his tax liability was approximately $2,900 for the year 1960; he thought that he had a small loss for the year 1961, and that there was some tax due for the year 1962, amount not specified." The tax liabilities shown on the returns as actually filed and audited were $2,590.45 for 1960; $1,745.79 for 1961, and $5,318.78 for 1962 as previously set forth.

the instant case for concluding that respondent's offense involved moral turpitude. The record shows no intent on his part to avoid ultimately filing his return or paying his taxes with penalties and interest. He is not shown to have falsified records, made deceptive statements to revenue agents, testified untruthfully, or committed any other act of dishonesty. There is no showing that his income tax delinquencies or his accompanying state of mind impaired his performance of professional duties to his clients in an honest and faithful manner.

The question whether the failure to file an income tax return is necessarily a crime of moral turpitude has been dealt with by the highest courts of a number of states.[6] A majority of these courts hold that moral turpitude is not necessarily involved.[7] A number of the states included in this majority nevertheless impose discipline for simple failure to file because they deem discipline necessary to maintain public respect for the profession.[8] Some of the minority of courts who characterize the offense as one of moral turpitude also give this reason for imposing discipline.[9] Several courts have invoked in support of this ground for discipline the precepts of the former Canons of Ethics of the American Bar Association "to uphold the honor and to maintain the dignity of the profession" (Canon 29) and to "observe . . . the statute law" and maintain "fidelity to private trust and

[6]The cases are collected in an annotation at 59 A.L.R.2d 1398. For reasons stated in footnote 14, *infra*, the published decisions are unlikely to represent all the jurisdictions in which failure to file an income tax return is considered not an automatic ground for discipline.

[7]See cases cited in footnote 8, *infra*, in addition to the following: *In re McShane* (1961) 122 Vt. 442 [175 A.2d 508] (no bad faith or evil intent, but reprimand for carelessness); *Kentucky State Bar Assn.* v. *Brown* (Ky. 1957) 302 S.W.2d 834 (no discipline); *Kentucky State Bar Assn.* v. *McAfee* (Ky. 1957) 301 S.W.2d 899 (no moral turpitude, but reprimand given); *Application of Bar Ass'n of Nassau County* (1957) 4 App.Div.2d 673 [163 N.Y.S.2d 752] (fraudulent tax returns; no moral turpitude).

[8]*In re Ford's Case* (1959) 102 N.H. 24 [149 A.2d 863]; *Baumeister* v. *Bar Assn. of Erie County* (1970) 33 App.Div.2d 224 [306 N.Y.S.2d 637]; *Cleveland Bar Ass'n* v. *Bilinski* (1964) 177 Ohio St. 43 [201 N.E.2d 878]; *In re English* (1964) 64 Wn.2d 129 [390 P.2d 999] (imposing discipline without comment on committee finding of no moral turpitude); *State* v. *Roggensack* (1963) 19 Wis.2d 38 [119 N.W.2d 412]; *Commitee on Legal Ethics* v. *Scherr* (1965) 149 W.Va. 721 [143 S.E.2d 141].

[9]*In re Lambert* (1970) 47 Ill.2d 223 [265 N.E.2d 101]; *State* v. *Fitzgerald* (1957) 165 Neb. 212 [85 N.W.2d 323]; *Rheb* v. *Bar Assn. of Baltimore City* (1946) 186 Md. 200, 204-205 [46 A.2d 289, 291]. Three other states also treat the offense as one of moral turpitude: *In re Lurkins* (Mo. 1964) 374 S.W.2d 67; *In re Kline* (1970) 156 Mont. 177 [477 P.2d 881]; *In re Walker* (1965) 240 Ore. 65 [399 P.2d 1015] (by implication). New Jersey imposes discipline without stating a position on whether the offense involves moral turpitude. (*In re Vieser* (1970) 56 N.J. 60 [264 A.2d 445].)

to public duty, as an honest man and as a patriotic and loyal citizen" (Canon 32).[10]

As of January 1, 1970, the Canons of Ethics were superseded by a new Code of Professional Responsibility.[11] This code separates the subject matter of the former canons into "Disciplinary Rules," which are mandatory and intended as a basis for discipline, and "Ethical Considerations," which are "aspirational in character" and not intended as disciplinary standards.[12] The exhortations of former Canons 29 and 32 to observe the law and uphold the honor and dignity of the profession have been incorporated into the Ethical Considerations but not the disciplinary rules of the new code.[13] We agree with this treatment. Offenses that do not involve moral turpitude or affect professional performance should not be a basis for professional discipline simply because they fall short of the highest standards of professional ethics or may in some way impair the public image of the profession. Otherwise the imposition of discipline may tend to be influenced by the degree to which the offense has become known to the public. (See Weckstein, *Maintaining the Integrity and Competence of the Legal Profession*, 48 Texas L. Rev. 267, 279.)[14] ■ Our standard of moral turpitude depends not on popular impressions but on the violator's own motivation as it relates to his moral fitness to practice law. (*Hallinan* v. *Committee of Bar Examiners, supra,* 65 Cal.2d 447, 461-462; see *Yakov* v. *Board of Medical Examiners, supra,* 68 Cal.2d 67, 73-74.)

[10]See *State* v. *Fitzgerald, supra,* 165 Neb. 212, fn. 9, and the following cases cited in footnote 8, *supra: Baumeister* v. *Bar Assn. of Erie County, supra,* 33 App.Div.2d 224; *Cleveland Bar Ass'n* v. *Bilinski, supra,* 177 Ohio St. 43; *State* v. *Roggensack, supra,* 19 Wis.2d 38; *Committee on Legal Ethics* v. *Scherr, supra,* 149 W.Va. 721.

[11]Rule 1 of the Rules of Professional Conduct of the State Bar of California was amended as of January 1, 1970, to delete its reference to the former Canons of Ethics, and to read in pertinent part as follows: "The specification in these rules of certain conduct as unprofessional is not to be interpreted as an approval of conduct not specifically mentioned. In that connection the Code of Professional Responsibility of the American Bar Association should be noted by members of the State Bar."

[12]American Bar Association, Code of Professional Responsibility, Preamble and Preliminary Statement.

[13]See American Bar Association, Code of Professional Responsibility, Ethical Considerations EC 1-5, EC 9-1 and EC 9-6.

[14]Because professional disciplinary proceedings, unlike criminal proceedings, usually remain confidential unless and until a decision is reached to impose discipline, cases in which discipline is imposed are more likely to become the subject of published opinions than cases in which the proceeding is dismissed. Thus, in addition to the states whose reported decisions indicate imposition of discipline for failure to file income tax returns (see fns. 7, 8 and 9), there may be other states in which discipline is not imposed even though that fact is not reflected in published reports.

Clearly we do not condone respondent's income tax delinquencies. His conduct has demeaned not only himself but also the high profession which he serves. ▮▮▮ We hold, however, that under the circumstances of this case such conduct does not constitute moral turpitude and so does not "characterize him as unsuitable to practice law." (*In re Higbie, supra,* 6 Cal.3d 562, 570.)

The proceeding is dismissed.