[Civ. No. 67851. Second Dist., Div. Seven. Dec. 15, 1983.]

HENRY H., Plaintiff and Appellant, v.
BOARD OF PENSION COMMISSIONERS OF THE
CITY OF LOS ANGELES, Defendant and Respondent.

968

---

COUNSEL

Lewis, Marenstein & Kadar and Michael T. Roberts for Plaintiff and Appellant.

Ira Reiner, City Attorney, Siegfried O. Hillmer, Assistant City Attorney, for Defendant and Respondent.

OPINION

**THOMPSON, J.**—Appellant Henry H. appeals from the superior court judgment denying his petition for a writ of mandate to compel the Board of Pension Commissioners of the City of Los Angeles (Board) to grant him a disability pension. Appellant contends that he was improperly denied pension benefits on the ground set forth in the charter that the disability "was due to or caused by . . . moral turpitude" (L.A. City Charter, art. XVIII, § 190.12)[1] because the charter provisions do not define "moral turpitude;" any moral turpitude herein was a symptom, rather than a cause, of his disability; and the Board had previously claimed that he was not disabled. We disagree, and for the reasons that follow, will affirm the judgment.

Appellant worked as a Los Angeles Police Department officer from 1971 to 1978. In June 1978, pursuant to article XVIII, section 190.12, appellant applied for a disability pension claiming service-connected psychiatric disability.[2]

Appellant was examined by four psychiatrists and a psychologist whose reports were submitted as evidence to the Board.[3] Appellant told the doctors that he had been sexually molesting (or fondling) his stepdaughter since 1976 when she was eight years old, claiming it afforded him a "release and escape."[4] He also told the doctors that he had sexually propositioned his sister in the spring of 1978.

Following a duly noticed and due process hearing before the Board on June 21 and June 28, 1979, the Board found appellant was capable of per-

---

[1]Unless otherwise indicated, all section references are to the Los Angeles City Charter.

[2]Appellant had previously been awarded a 47 percent disability for back injury and was on light duty.

[3]The Board had referred appellant to three psychiatrists (Dr. Eric Marcus, Dr. Seymour Leshin, and Dr. John Woodard) for evaluation in 1978 and 1979. Additionally, the 1978 reports of a psychiatrist (Dr. Henry Wilson) and a psychologist (Dr. William Kroes) utilized in a related Workers' Compensation proceeding were entered into evidence. Appellant received psychotherapy from Dr. Kroes.

[4]Said sexual behavior as reported by him included fondling her, kissing her body, sex organs and buttocks, and exposing himself to her. He stated there had been no sexual intercourse and she never touched him. In 1979, he claimed he was reducing contact with his stepdaughter but still played with and kissed her breasts.

forming the duties to which he might be assigned and denied his application for a disability pension.

Appellant then challenged the Board's decision by filing a petition for a peremptory writ of mandate in the superior court (case No. C 297576). In April 1980, the superior court granted the petition and ordered the Board to set aside its finding that appellant was not disabled from performing the duties of his employment and enter a new finding that he was so disabled. The Board was also ordered to make a finding that appellant's disability was not caused by the discharge of his duties. No appeal was taken from that judgment.

Thereafter, the matter was returned to the Board which held a hearing on July 3, 1980. At the hearing, which included consideration of the previously submitted medical reports, the Board first voted, pursuant to the court's order, to set aside its prior decision denying the disability pension. The Board then determined, by a vote of four to three, that appellant was incapacitated by a nonservice-connected disability but further found that such disability was caused by appellant's moral turpitude and therefore denied his application.

Appellant then filed a petition for mandamus relief, asking the court to order the Board to set aside and vacate its decision and substitute instead a finding that appellant's disability arose out of and occurred in the course of his employment entitling him to a service-connected disability pension under article XVIII, section 190.12. The Board argued in response that the prior superior court judgment that the disability was not service-connected was res judicata of that issue, and the moral turpitude exclusion was properly invoked to deny appellant a pension. The court took judicial notice, as requested, of the prior court proceeding (case No. C 297576). By stipulation, the exhibits attached to the petition and answer were deemed to be the administrative record and were received in evidence by reference. The court applied the independent judgment test and found that there was no abuse of discretion, the evidence supported the findings and the findings supported the conclusion made. The court then denied the writ. This appeal followed.

■ *The Board Properly Followed the Procedures for Determination of Disability*

Section 190.12 governs eligibility of a Los Angeles Police Department officer for a disability pension. Subsection (a) provides for a service-connected disability pension for a police officer "whom the Board shall determine has become physically or mentally incapacitated by reason of injuries received or sickness caused by the discharge of the duties of such person as

a Department Member, and who is incapable as a result thereof from performing his duties . . . ."

Subdivision (b) provides for a nonservice-connected disability pension in a lesser amount for a Department Member "whom the Board shall determine has become physically or mentally incapacitated by reason of injuries or sickness other than injuries received or sickness caused by the discharge of the duties of such person as a Department Member, and who is incapable as a result thereof from performing his duties, and *if the Board further shall determine that such disability was not due to or caused by the moral turpitude of such System Member . . . ."* (Italics added.)

Subsection (c) explicitly sets forth the following three-step procedure to be followed for the "[d]etermination of [d]isability": "*The Board first shall determine whether or not the System Member is incapable of or from performing his duties as a Department Member. If the Board were to determine that he is not so incapable, it then shall be the duty of the Board to deny the application or request. If the Board were to determine that he is so incapable, it then shall determine,* pursuant to the language used in subsections (a) and (b) of this section, *whether his incapacity or disability is service-connected or nonservice-connected.* If the Board were to determine that it is service-connected, it then shall determine the percentage of his incapacity or disability, within the limitations prescribed in subsection (a) of this section, and shall grant the application or request accordingly. *If the Board were to determine that it is nonservice-connected, it then shall determine whether his incapacity or disability was due to or cause[d] by the moral turpitude of the System Member. If the Board were to determine that it was so caused, it then shall be the duty of the Board to deny the application or request.* If the Board were to determine that it was not so caused, it shall grant the application or request in the percentage prescribed by subsection (b) of this section." (Italics added.)

Initially, we note that neither the Board's initial position that appellant was not incapable nor the superior court judgment in April 1980 precludes the Board's subsequent finding that petitioner is not entitled to a pension because of his moral turpitude. The previously recited charter provisions explicitly spell out a three-stage process for determining entitlement to a disability pension. That procedure was followed here.

Since the Board initially found no incapacity, a decision on the issue of moral turpitude at that time was unnecessary as premature. The Board's mandatory duty was simply to deny the application. Appellant, however, then successfully challenged that decision and obtained mandamus relief in the superior court. The court ordered the Board to vacate its prior decision

and enter new findings that appellant was disabled but also that the disability was nonservice-connected. That judgment became final and the matter was then returned to the Board.

The Board properly complied with the court's order and entered the appropriate determinations. Then, in accordance with charter procedures, it made the requisite determination as to whether the nonservice-connected disability was due to or caused by moral turpitude and, having so determined, denied the application.

*Substantial Evidence Supports the Denial of Pension Benefits on Grounds Appellant's Disability Was Caused by Moral Turpitude*

Appellant further claims that he cannot be denied pension benefits because the charter provision provides for a denial of benefits when a disability is "due to or caused by moral turpitude," and the medical record herein reflects that the moral turpitude, or sexual deviancy, was only a symptom of a mental problem of anxiety neurosis and depression. We do not agree.

Where, as here, the trial court has exercised its independent judgment, the role of the appellate court is to determine only whether there is substantial evidence to support that judgment. (*Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 69 [64 Cal.Rptr. 785, 435 P.2d 553].) Appellant here did not request any findings. In the absence of such findings and resolving all doubts in favor of the judgment, we search the record for the purpose only of determining the sufficiency of the evidence. (*Golde* v. *Fox* (1979) 98 Cal.App.3d 167, 173-174 [159 Cal.Rptr. 864].)

Here, there is credible competent evidence supporting the trial court's implicit finding that petitioner's moral turpitude was an independent cause of disability, not just a symptom or manifestation of his anxiety. One of the psychiatrists who examined appellant (Dr. Wilson) set out in his July 26, 1978 report that "[p]sychiatrically, the claimant's problem is that of sex perversion." Wilson diagnosed appellant as suffering from a preexisting passive-aggressive personality and from multiple sex perversions of pedophilia and incest. In his August 1978 report, Wilson explicitly rejected the notion that petitioner's sexual deviation could be diagnosed as merely a symptom of anxiety. The psychiatrist pointed out that "[t]his kind of reasoning could appear only in the course of litigation . . . and in no conceivable way represents the diagnostic criteria of the medical community or . . . of the psychologic[al] community. Sex perversion is just that, namely a separate diagnostic category and in no conceivable way can be considered a manifestation of an anxiety reaction. . . ."

Similarly, another psychiatrist (Leshin) gave two separate diagnoses of appellant: anxiety neurosis with depression; and sexual deviation, child molestation. In his September 1978 report, Leshin further distinguished between the two diagnoses, stating that "[a]lthough [appellant's] anxiety and depressive symptoms seem to be related to his conflicts [in] police work and his relations with police officers, his sexual deviation is probably [a] deeper personality trait disturbance that undoubtedly had its origin long before he entered the Police Department."

Moreover, it is clear from the medical reports that the doctors, as well as appellant himself, considered his aberrant sexual behavior towards his minor stepdaughter, not his anxiety, as the crucial disabling disturbance in his personality. For example, in February 1979, Leshin recommended that appellant be hospitalized for more intensive psychotherapy because he had continued with his child molestation behavior and did not have adequate control over his impulses. The doctor further stated that if he were not hospitalized, he and his stepdaughter should be separated and the child have psychological evaluation and psychotherapy. Another psychiatrist (Marcus) reported that appellant's one-hour-per-week psychotherapy was inadequate to stop his aberrant sexual behavior and strongly urged intensive psychotherapy including participation in a group for sexual offenders.

Thus, there was sufficient evidence of a connection between appellant's sexual molestation of his stepdaughter and his psychiatric disability to warrant invoking the moral turpitude exclusion.

■ Payment of retirement benefits is voluntary under state law and subject to contractual arrangements between employer and employee. (*City etc. of San Francisco* v. *Workmen's Comp. App. Bd.* (1970) 2 Cal.3d 1001, 1010 [88 Cal.Rptr. 371, 472 P.2d 459].) A public employee is not entitled as a matter of right to a pension unless the government contracts to give him such right. (49 Cal.Jur.3d, Pension & Retirement Systems, § 16, p. 234.)

■ Pension payments constitute deferred compensation to which a public employee becomes entitled upon fulfillment of the contract terms. (*Wallace* v. *City of Fresno* (1954) 42 Cal.2d 180, 184-185 [265 P.2d 884].) Since a public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment, such a pension right may not be destroyed, once vested, without impairing a contractual obligation of the employing public entity. (*International Assn. of Firefighters* v. *City of San Diego* (1983) 34 Cal.3d 292, 300 [193 Cal.Rptr. 871, 667 P.2d 675].)

It is the rule that *"[i]n the absence of a valid charter provision enacted prior to eligibility for retirement which provides for forfeiture,* once a person who has undertaken public employment under an authorized public employees' retirement plan becomes eligible for retirement, his right to a pension cannot be destroyed merely because he is subsequently removed from office for his own misconduct." (Italics added.) (*Pearson* v. *County of Los Angeles* (1957) 49 Cal.2d 523, 543 [319 P.2d 624]; accord, *Willens* v. *Commission on Judicial Qualifications* (1973) 10 Cal.3d 451, 458 [110 Cal.Rptr. 713, 516 P.2d 1].)

But the fact that the pension right is vested does not prevent its loss on occurrence of a condition contained in the pension statute at the time of employment. (Compare *Skaggs* v. *City of Los Angeles* (1954) 43 Cal.2d 497 [275 P.2d 9], with *MacIntyre* v. *Retirement Board of S. F.* (1941) 42 Cal.App.2d 734 [109 P.2d 962].) The vesting is subject to contingencies which may cause a forfeiture or disentitlement if the pension statute so provides. (Cf. *Estate of Lindquist* (1944) 25 Cal.2d 697, 706-707 [154 P.2d 879].) "[W]hen a city originally sets up its pension system it has a rather wide latitude in prescribing the terms and conditions for retirement, and it may adopt restrictions that would be considered unreasonable impairments of the contract if subsequently imposed upon employees who have served under the pension plan." (*Wallace* v. *City of Fresno, supra,* 42 Cal.2d at p. 183.)

The pension system set forth in article XVIII of the City Charter herein constitutes part of the employment contract between appellant and the city. (*Lyons* v. *Workmen's Comp. Appeals Bd.* (1975) 44 Cal.App.3d 1007, 1021 [119 Cal.Rptr. 159].) Thus, the city's right to deny appellant a disability pension depends upon the existence of an express forfeiture provision in that charter at the time of his employment. Here, the explicit moral turpitude exclusion provided in subsections (b) and (c) of section 190.12 was included in the original enactment of that pension system which was effective in 1967, long before appellant was employed by the city.

Although pension legislation should be liberally construed, this rule is applied for the purpose of effectuating the obvious legislative intent and should not blindly be followed so as to eradicate the language and the purpose of the ordinance by allowing eligibility for those for whom it obviously was not intended. (*Neeley* v. *Board of Retirement* (1974) 36 Cal.App.3d 815, 822-823 [111 Cal.Rptr. 841]; *Meyers* v. *Fire & Police Pension System* (1973) 32 Cal.App.3d 725, 730 [108 Cal.Rptr. 429].)

The city obviously intended to restrict eligibility for a nonservice-connected disability pension. The city's disability pensions are funded solely

by tax money. (§ 190.06; *Wesley* v. *Board of Pension Commissioners* (1981) 119 Cal.App.3d 471, 473-474 [174 Cal.Rptr. 75]; *Lyons* v. *Workmen's Comp. Appeals Bd.*, *supra*, 44 Cal.App.3d at pp. 1013-1014.)

It is evident the purpose of the provision was, as a matter of public policy, to prevent the expenditure of public funds to financially support a police officer who, but for his own misconduct, would still be capable of functioning as a police officer and might not have become a liability to taxpayers. Analogous provisions affecting pension rights in cases of misconduct appear elsewhere in the city charter's disability provisions (see, e.g., ch. XVII, § 182-¼ [moral turpitude exclusion]; ch. XXXIV, § 510 [misconduct exclusion for pension for other than police and firefighters]) and in the State Public Employees Retirement System (see, e.g., Govt. Code §§ 21295, subd. (b); 21299.)

There is no merit to appellant's claim that the moral turpitude provision cannot be invoked to deny him benefits because the charter does not specifically define moral turpitude. The lack of a charter definition does not render the provision unenforceable. Thus, for example Business and Professions Code 6106 provides that "[t]he commission of any act involving moral turpitude, . . . whether the act is committed in the course of his relations as an attorney or otherwise, and whether the act is a felony or a misdemeanor or not, constitutes a cause for disbarment or suspension."

Similarly, under federal law, a crime "involving moral turpitude" is a basis for exclusion or deportation of aliens. (See 8 U.S.C. §§ 1182(a)(9); 1251(a)(4); see also Annot. (1975) What Constitutes "Crimes Involving Moral Turpitude" Within Meaning of §§ 212(a)(9) and 241(a)(4) of Immigration and Nationality Act (8 USC §§ 1182(a)(9), 1251(a)(4)), and Similar Predecessor Statutes Providing for Exclusion or Deportation of Aliens Convicted of Such Crime, 23 A.L.R.Fed. 480.)

The elusive concept of "moral turpitude" has long been the subject of judicial scrutiny. (*Rice* v. *Alcoholic Beverage etc. Appeals Bd.* (1979) 89 Cal.App.3d 30, 36 [152 Cal.Rptr. 285].) Our Supreme Court has recognized that juristic definitions of moral turpitude have been general. (*Yakov* v. *Board of Medical Examiners*, *supra*, 68 Cal.2d 67, 73.) California courts have dealt with the amorphous term in various factual contexts, mainly involving disciplinary proceedings. (See, e.g., *Dixon* v. *State Bar* (1982) 32 Cal.3d 728 [187 Cal.Rptr. 30, 653 P.2d 321]; *In re Duggan* (1976) 17 Cal.3d 416 [130 Cal.Rptr. 715, 551 P.2d 19]; *In re Fahey* (1973) 8 Cal.3d 842 [106 Cal.Rptr. 313, 505 P.2d 1369, 63 A.L.R.3d 465]; *In re Higbie* (1972) 6 Cal.3d 562 [99 Cal.Rptr. 865, 493 P.2d 97]; *In re Hallinan* (1954) 43 Cal.2d 243 [272 P.2d 768] [attorney]; *Morrison* v. *State Board of Edu-*

*cation* (1969) 1 Cal.3d 214 [82 Cal.Rptr. 175, 461 P.2d 375] [school teacher]; *Yakov* v. *Board of Medical Examiners, supra,* 68 Cal.2d 67 [medical doctor]; *Hallinan* v. *Committee of Bar Examiners* (1966) 65 Cal.2d 447 [55 Cal.Rptr. 228, 421 P.2d 76] [bar admittee]; *Golde* v. *Fox, supra,* 98 Cal.App.3d 167 [real estate broker]; *Rice* v. *Alcoholic Beverage etc. Appeals Bd., supra,* 89 Cal.App.3d 30 [liquor license]; *Otash* v. *Bureau of Private Investigators* (1964) 230 Cal.App.2d 568 [41 Cal.Rptr. 263] [private investigator].)[5]

 For almost half a century our Supreme Court has consistently defined moral turpitude as "an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellowmen, or to society in general, contrary to the accepted and customary rule of right and duty between man and man." (*In re Craig* (1938) 12 Cal.2d 93, 97 [82 P.2d 442]; see also *Dixon* v. *State Bar, supra,* 32 Cal.3d at pp. 738-739; *In re Fahey, supra,* 8 Cal.3d at p. 849; *In re Higbie, supra,* 6 Cal.3d at p. 569; *In re Boyd* (1957) 48 Cal.2d 69, 70 [307 P.2d 625].)

Despite its frequency of use, the concept by nature defies any attempt at a more precise definition. (See *Rice* v. *Alcoholic Beverage etc. Appeals Bd., supra,* 89 Cal.App.3d at p. 36.) Moral turpitude is innately a relative concept, dependent on contemporary moral values as well as the motivation of the violator and the degree of its inimical quality. (*In re Fahey, supra,* 8 Cal.3d at pp. 849, 853; *In re Higbie, supra,* 6 Cal.3d at p. 570; *Rice* v. *Alcoholic Beverage etc. Appeals Bd., supra,* 89 Cal.App.3d at p. 36.)

 We need not delineate, in the abstract, the outer limits of a police officer's conduct which could constitute moral turpitude for the purpose of disentitlement to nonservice-connected disability pension benefits. Here, it cannot be seriously doubted that appellant's admitted sexual conduct with his minor stepdaughter is so reprehensible as to be offensive to every concept of morality and to fall within any contemporary definition of moral turpitude. Since his admitted behavior reflects "depravity," "vileness" and antisocial conduct measured by any contemporary standard, we conclude that this conduct constituted a sufficient basis for invocation of the pension forfeiture provision as authorized by the charter.

---

[5]Normally moral turpitude is used as a ground to discipline a licensee and requires a rational nexus between the immoral conduct and fitness to practice the licensed vocation. (See, e.g., *Morrison* v. *State Board of Education, supra,* 1 Cal.3d at pp. 220-229; *Board of Education* v. *Jack M.* (1977) 19 Cal.3d 691, 696-697 [139 Cal.Rptr. 700, 566 P.2d 602], and cases cited at p. 702, fn. 6.) However, in this case we need not be concerned with a rational nexus because moral turpitude is only considered within the context of a nonservice-connected disability.

The judgment is affirmed.

Schauer, P. J., and Johnson, J., concurred.