[No. B007155. Second Dist., Div. Six. Dec. 17, 1985.]

THE PEOPLE, Plaintiff and Appellant, v.
FRED JAY MAZZA, Defendant and Appellant.

COUNSEL

John K. Van de Kamp, Attorney General, Gary R. Hahn, Supervising Deputy Attorney General, and Patra Woolum, Deputy Attorney General, for Plaintiff and Appellant.

Michael S. Mink, under appointment by the Court of Appeal, for Defendant and Appellant.

OPINION

HINTZ, J.*—Fred Jay Mazza appeals from his conviction of second degree murder, enhanced by the use of a firearm and by a prior felony conviction. He alleges five grounds for his appeal: first, that three statements made by him should have been excluded because he was not advised of his *Miranda* rights; second, that his testimony was improperly impeached by a prior felony conviction; third, that the trial court erred in allowing the introduction of a photograph of the victim taken while she was alive; fourth, that there was improper rebuttal testimony; and fifth, that there was improper argument by the prosecutor. None of his contentions has merit.

*Assigned by the Chairperson of the Judicial Council.

## I

The facts bearing on appellant's first contention are essentially uncontested. About 11:55 p.m. on New Year's Eve 1983, Mazza telephoned the Morro Bay Police Department and reported that his girlfriend was dead and that "somebody" had shot her. Lieutenant George Carpenter was the first officer to arrive at the victim's apartment. Mazza was standing in the open doorway. The victim was seated in a chair in the living room, shot in the forehead. Carpenter did not suspect Mazza of the crime. He saw that Mazza was emotionally upset and talkative. He could tell that Mazza had been drinking by the heavy smell of alcohol and the visible unsteadiness of Mazza's footing. As Carpenter entered the living room, he asked what had happened. Mazza said that he had gone out to test drive his car and that when he returned he found the victim dead. Carpenter noted that Mazza's statements were rambling and emotional; that although the statement was a little "jumbled up," it made sense; and that although Mazza was coherent, his speech showed the effects of alcohol consumption.

Carpenter told Mazza to step into the kitchen to talk to him some more because the presence of the body was upsetting Mazza. In the kitchen Mazza repeated what he had said in the living room. Mazza received a telephone call and talked for several minutes before Carpenter asked him to hang up so the police could secure the crime scene. Carpenter still did not suspect Mazza, testifying "I didn't even know what had taken place at that point." Carpenter asked Mazza if he would go to the police station to make a statement, so the scene could be secured and so the body would not continue to upset Mazza. Mazza agreed to go to the station. He did not ask to go anywhere else. He was not arrested, detained or handcuffed. He was not the focus of the investigation.

Officer Norman Smyth seated Mazza in the back of a patrol car. Mazza told him that he wanted to kill the person who had done this. Smyth told Mazza to relax and stay calm. Smyth explained again to Mazza that the police had to secure the crime scene. Smyth checked at least twice while they were waiting to leave to make sure Mazza was all right. Mazza was weeping. Mazza could not have gotten out of the patrol car without Smyth's assistance since there were no door handles in the inside of the rear doors, but Mazza never showed any interest in getting out. About 20 minutes passed before Mazza actually was taken to the station.

Sergeant Hileman rode with Mazza. His reasons for taking Mazza to the station were the lateness of the hour, the coldness of the night, and the convenience of the police station. They went directly to an interview room, where Hileman asked Mazza what had happened. This interview occurred

about 1:05 a.m., and is the first statement about which Mazza complains. This statement, like the ones at 1:20 a.m. and 4 a.m., was apparently given without aggressive questioning. The 1:05 a.m. statement was a slightly more detailed description of Mazza's activities of the preceding evening. After the statement, Mazza voluntarily gave consent for a search of the crime scene. He consented to another officer's request for a test of his hands for gunshot residue. The other officer told Hileman (but not Mazza) that Mazza was a "potential" suspect. Hileman attached no significance to the other officer's opinion, and it did not alter his perceptions of Mazza as an ordinary witness. Mazza refused to take an alcohol test. Hileman said that he did not push that test because Mazza was just another witness at that point.

Hileman never told Mazza that he had to remain at the police station. Hileman did say that he would be waiting at the station to see what information came in and that Mazza was also free to wait there to find out what had happened. Mazza decided on his own to wait. During the time Mazza was at the station, he was free to walk wherever he wanted. He went to the bathroom alone, and he went to another room alone to get coffee. He could have left the station through any of several doors.

About 1:20 a.m. Hileman talked again to Mazza. This statement was more detailed, although it was still rambling and not in chronological order. Mazza was still crying. After this statement, Mazza made a telephone call to the victim's employer, Sophie Hill. Hill came to the station and talked with Mazza alone for several minutes. Hileman said that Mazza did not try to leave with Hill. After Hill left, Mazza slept for close to two hours.

About 4 a.m., Mazza awoke and told Hileman that he had remembered more information. The statement which followed was clearer and more coherent. Following this conversation, Hileman compared notes with other officers investigating the shooting. Some officers who had just listened to the tape recording of the original telephone call believed Mazza had said "I shot her." Statements from neighbors indicated that Mazza had been at the apartment about the time of the shooting. There were internal inconsistencies in Mazza's statements. Hileman then formed the opinion that Mazza was a suspect and advised him of his *Miranda* rights about 4:55 a.m. Further interviews ensued.

Mazza's own testimony on this issue is more significant for what he did not say than for what he did say. He said he did not think the officers should have talked to him at all, but only because of his emotional state. He never testified that he thought his freedom was restricted or that he thought he was a suspect. He did not even remember substantial parts of the time he

was at the station. The gunshot residue test made no impression on him. He did not even remember being offered the alcohol test. The only point on which he differed with the police testimony was that he said he had wanted to leave with Sophie Hill. When he stood up to leave with her, an officer told him they still had a few things to talk to him about, and so he did not leave. On this point, the trial judge believed Hileman, not Mazza.[1]

■ Mazza asserts that the statements he gave at 1:05 a.m., 1:20 a.m. and 4 a.m. were custodial interrogations in violation of his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. Under *Miranda*, custodial interrogation begins when a person has been taken into custody or has otherwise been deprived of his freedom of action in any significant way. In California, the rule has been that custodial interrogation begins not only if a person is actually in custody or is actually deprived of his freedom in any significant way, but also if he reasonably believes that he is so deprived. (*People* v. *Arnold* (1967) 66 Cal.2d 438 [58 Cal.Rptr. 115, 426 P.2d 515].) While questioning at a police station by a police officer may be viewed as presumptively coercive, such interviews may not constitute custodial interrogation where the objective indicia of restraint or compulsion are lacking. In *People* v. *Hill* (1969) 70 Cal.2d 678 [76 Cal.Rptr. 225, 452 P.2d 329], the defendant voluntarily went to the police station and made a series of statements about his activities. As to the earliest statements Hill made, the court found that the police had merely afforded him the opportunity of accounting for his activities. In *People* v. *White* (1968) 69 Cal.2d 751 [72 Cal.Rptr. 873, 446 P.2d 993], the court found no objective indicia of restraint or compulsion in the defendant's interview at the police station until a direct accusation was made and the defendant was required to try on some clothing found at the murder scene. In *People* v. *Sam* (1969) 71 Cal.2d 194 [77 Cal.Rptr. 804, 454 P.2d 700], the court noted that taking statements from witnesses who were at the scene was routine police investigatory procedure and not in-custody interrogation, even if the statements were taken at the police station. The United States Supreme Court held in *Oregon* v. *Mathiason* (1977) 429 U.S. 492 [50 L.Ed.2d 714, 97 S.Ct. 711], that questioning in the coercive environment of the police station does not necessarily convert a noncustodial situation into one in which *Miranda* applies, in part because any interview with the police would have some coercive aspects to it.

*California* v. *Beheler* (1983) 463 U.S. 1121 [77 L.Ed.2d 1275, 103 S.Ct. 3517], answers any question whether Mazza was actually in custody or was

---

[1]Hill did not testify at the pretrial hearing. We note, however, that when she testified in the case-in-chief, she directly contradicted Mazza. She said he did not try to leave the building with her, and he was never called back by a police officer.

actually significantly deprived of his freedom as defined in *Miranda*. Beheler made the original call to the police reporting a killing. He had been drinking and was emotionally distraught. He made exculpatory statements at the scene. He gave consent to search. He voluntarily went to the police station to make a further statement. He was told that he was not under arrest. He was not detained in any way. He was interviewed for 30 minutes without being advised of his *Miranda* rights. The Supreme Court applied a "totality of circumstances" test, similar to its search ruling in *Illinois* v. *Gates* (1983) 462 U.S. 213 [76 L.Ed.2d 527, 103 S.Ct. 2317], and held that the circumstances of each case must influence the determination of whether the suspect is in custody. "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." (*California* v. *Beheler, supra,* 463 U.S. at p. 1125 [77 L.Ed.2d at p. 1279].) The court held that Beheler had not been subjected to a custodial interrogation. (See also *Green* v. *Superior Court* (1985) 40 Cal.3d 126 [219 Cal.Rptr. 186, 707 P.2d 248], where the court held the defendant had not been subjected to custodial interrogation despite pointed questioning and requests for chemical tests.)

It takes no extensive comparison of the factual situations to realize that if Beheler was not subjected to actual custodial interrogation, neither was Mazza. Nor is there anything in the record from which it could be concluded that Mazza could reasonably have believed he was in custody or deprived of his freedom. During all of the proceedings up to the time Hileman compared notes with other officers, Mazza was treated with the deference due a grieving boyfriend who might have turned out to be an important witness. Neither was he subjected to an actual custodial interrogation, nor would it have been reasonable for him to believe so.[2]

## II

Mazza asserts that the trial court erred in allowing impeachment of his trial testimony with a prior rape conviction. Before trial, Mazza moved that he not be impeached with that conviction in the event he testified. The trial court ruled, "I feel bound by the language of Proposition 8 as to the six year old prior rape conviction and I will deny the motion to exclude evidence as to that conviction." Thereafter, during Mazza's testimony, his own attorney brought out that Mazza had been convicted of rape and had served a term therefor in the state prison. The jury was later properly instructed on the limitations on their possible use of that evidence.

---

[2]By so ruling, we need not address the interesting question posed by the respondent whether the "reasonable belief" test of *Arnold* survives *Beheler* and the enactment of the constitutional provisions contained within the ballot initiative popularly known as Proposition 8.

█ The trial court did err when it failed to exercise its discretion under Evidence Code section 352 in deciding whether to allow the use of the prior conviction for impeachment. In *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111], a majority of our Supreme Court agreed that a trial court's discretion under Evidence Code section 352 survives the passage of article I, section 28, subdivision (f) of the California Constitution by the ballot initiative popularly known as Proposition 8. *Castro* directs us, however, to examine whether the error was prejudicial.

A majority of the *Castro* court agreed that the standard of discretion to be used in determining the admissibility of a prior conviction is whether the prior offense necessarily involves moral turpitude. █ Mazza contends, in apparent seriousness, that rape is not a crime involving moral turpitude. We note with some surprise that there is no published case in California directly holding that rape is a crime involving moral turpitude. "Most of the cases involve statutory rape or attempted rape, rather than an actual forcible rape (as to which, like first degree murder, it would appear futile to argue that no 'moral turpitude' was involved)." (Annot. (1975) 23 A.L.R.Fed. 480, 567, fn. 82, cited in *Castro* with approval as part of the preexisting body of law concerning moral turpitude; see also *People* v. *Bonilla* (1985) 168 Cal.App.3d 201 [214 Cal.Rptr. 191], and *People* v. *Brewer* █(Cal.App.), holding, respectively, that assault with intent to commit rape, and forcible oral copulation and forcible sodomy, are crimes involving moral turpitude; and *People* v. *McCullar* █(Cal.App.), holding that statutory rape is not.)

While it may be suggested that the definition of moral turpitude may depend on the state of public morals, and that it may vary according to the community and the times (see *In re Higbie* (1972) 6 Cal.3d 562 [99 Cal.Rptr. 865, 493 P.2d 97]), it never has been suggested that our public morality has sunk so low as to countenance the singularly depraved act of rape. "Conviction of some crimes establishes moral turpitude on its face." (*In re Fahey* (1973) 8 Cal.3d 842, 849 [106 Cal.Rptr. 313, 505 P.2d 1369, 63 A.L.R.3d 465].) Moral turpitude has been defined as a " 'readiness to do evil' " (*People* v. *Castro, supra,* 38 Cal.3d at p. 314) and as a "character trait which can reasonably be characterized as 'immoral.' " (*Id.,* at p. 317, fn. 13.) An act of moral turpitude is " 'an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow men or to society in general, contrary to the accepted and customary rule of right and duty between man and man'." (Annot. (1975) 23 A.L.R.Fed.

480, 488.) Rape fits every suggested definition of moral turpitude. It is a reprehensible crime, offensive to every conception of morality. We hold that rape is a crime involving moral turpitude.

■ There is no reasonable probability that the trial court would have exercised its discretion by refusing to admit Mazza's prior rape conviction for purposes of impeachment. The conviction was neither too recent nor too remote; it was not similar to the charge before the jury; and there was clear proof that it had in fact occurred. Its existence did not deter Mazza from testifying. The trial judge took care to advise the jury of the limited purposes for which it might use the prior conviction. It does not appear reasonably probable that a result more favorable to Mazza would have occurred if the trial court had exercised its discretion. (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].) The admission of the prior conviction does not warrant reversal.

### III*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### VI

■ The district attorney filed an appeal pursuant to Penal Code section 1238, subdivision (a)(6),[3] contending that the trial court erred in sentencing Mazza to a three-year enhancement pursuant to section 667.5, subdivision (a), and not to a five-year enhancement pursuant to section 667, subdivision (a).

The record of trial shows that defendant was found guilty of the enhancements alleged pursuant to both of those sections. The clerk's minutes, however, only reflected the finding as to section 667.5, subdivision (a). At the time of sentencing, the court relied on the erroneous minutes and pronounced no sentence on the section 667, subdivision (a) enhancement. Two days later the judge recognized his error, stating that he "would have complied with the law under 667(A) . . ." but for the clerical error. He declined to modify his sentence, however, on the grounds that Mazza had already filed his appeal, the district attorney could file one also, and the appellate court could take care of the problem.

The effect of the judge's action was to strike the section 667, subdivision (a) enhancement for purposes of sentencing without exercising the discretion

---

*See footnote, *ante,* page 836.

[3]All further statutory references are to the Penal Code unless otherwise specified.

called for in *People* v. *Fritz* (1985) 40 Cal.3d 227 [219 Cal.Rptr. 460, 707 P.2d 833]. The trial court could not have deliberately stricken the section 667, subdivision (a) enhancement without exercising his sound discretion. What could not have been done deliberately cannot be allowed to happen accidentally. Mazza concedes as much in his response to the People's brief.

The judgment of conviction is affirmed. The case is remanded to the superior court for a new sentencing hearing.

Stone, P. J., and Abbe, J., concurred.