Filed 3/14/13  P. v. Travis CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>WILLIAM TRAVIS,<br><br>　　　　Defendant and Appellant. | H036440<br>(Santa Clara County<br>Super. Ct. No. CC946056) |

Following a jury trial, William Travis (appellant) was found guilty of attempted premeditated murder.  (Pen. Code, §§ 187, 664, subd. (a).)  The jury found true the allegation that appellant had personally used a handgun within the meaning of Penal Code section 12022.53, subdivisions (b), (c), and (d) and had personally inflicted great bodily injury on the victim Fred Williamson within the meaning of sections 1203, subdivision (e)(3) and 12022.7, subdivision (a).[1]  Subsequently, the court sentenced appellant to 32 years in state prison.

In this appeal appellant contends that his due process rights were violated when the prosecution suppressed favorable material evidence in violation of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).  Further, the trial court erred in excluding evidence that the victim in this case, Fred Williamson, had raped a former girlfriend.  Appellant has filed a

---

[1]　　All unspecified statutory references are to the Penal Code.

petition for writ of habeas corpus in which he asks that this court order an evidentiary hearing into what the prosecutor knew and when he knew it in connection with his claim of a *Brady* violation; alternatively, he asserts that his counsel was ineffective in failing to cross examine the prosecutor and prosecutor's investigator in connection with his post trial motion to set aside his conviction on *Brady* grounds.[2]  For reasons that follow, we affirm the judgment.  We have disposed of the habeas petition by separate order filed this day.  (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

*Testimony Adduced at Trial*

By 2009, appellant and Fred Williamson had known each other for about four years.  Appellant was Mr. Williamson's rap music producer and Mr. Williamson considered him to be a friend.  On May 30, 2009, appellant picked up Mr. Williamson at Mr. Williamson's house in a car driven by Tiara Lewis.  A second passenger was in the car.  This passenger was later identified as Ryne Scott, but at trial was referred to as Dreadlocks or Dreads because he sported a dreadlocks hairstyle.  Ms. Lewis drove her car to a friend's house where appellant's car was parked.  Appellant got into his car with Dreadlocks, but Mr. Williamson stayed in Ms. Lewis's car.  After stopping at a liquor store both parties drove in separate cars to San Jose to Aretha Dillard's house.

According to Ms. Lewis, on the way to San Jose Mr. Williamson asked Ms. Lewis about her relationship with Dreadlocks and appellant; Mr. Williamson made some derogatory comments about them.  Mr. Williamson told Ms. Lewis that he was jealous of appellant because appellant always had money.  Ms. Lewis thought that Mr. Williamson did not like appellant, which made her nervous.  At one point, Mr. Williamson pulled out some money as if he was trying to "entice" or impress her with the money.

Both parties arrived at Ms. Dillard's house around 10:00 p.m.  Ms. Dillard was making dinner for her two daughters.  Appellant and Ms. Dillard had had a dating

---

[2]     This court ordered the petition for writ of habeas corpus be considered with the appeal.

2

relationship for about three years and Ms. Dillard had known Mr. Williamson for a couple of years. Ms. Dillard did not know either Dreadlocks or Ms. Lewis.

At Ms. Dillard's house Ms. Lewis became nervous and anxious to leave. She told Dreadlocks about the conversation she had with Mr. Williamson on the journey to San Jose; she asked Dreadlocks not to say anything to appellant. At one point, when Dreadlocks and appellant stepped outside, Ms. Lewis suspected that Dreadlocks told appellant about her conversation with Mr. Williamson. This made Ms. Lewis grow increasingly uncomfortable.[3]

According to Ms. Dillard, at some point appellant announced that his keys were missing and said that someone must have his keys. Appellant said that he was going to check Mr. Williamson's pockets and patted him. Mr. Williamson said that he did not have appellant's keys. Eventually, Dreadlocks took the keys from his pocket and tossed them onto the couch.

Appellant went outside with Mr. Williamson and asked him if he was talking about him behind his back. Mr. Williamson denied that he had been so doing. Mr. Williamson went into the house while appellant, Dreadlocks, and Ms. Lewis remained outside for a while. After they came inside, Dreadlocks told Ms. Lewis to tell Mr. Williamson what she had been saying to him and appellant while they were outside. Dreadlocks pressured her to "say it." Ms. Lewis testified that she was getting really nervous and uncomfortable. Eventually, Ms. Lewis said that Mr. Williamson had called appellant a "jay-cat."[4] Ms. Lewis went upstairs to call a friend and when she returned she "bolted out the door."

---

[3]     Ms. Lewis referred to Dreadlocks as Reezy during her testimony. However, for the sake of clarity we refer to him as Dreadlocks throughout our discussion of the facts.

[4]     Mr. Williamson testified at trial that jay cat is a derogatory term for a person who "is not the sharpest knife in the drawer . . . ."

According to Mr. Williamson, both appellant and Dreadlocks pulled out guns and accused Mr. Williamson of calling appellant a jay cat.  Mr. Williamson became very scared; he testified he thought he was going to die.  Ms. Dillard entered the room, but appellant told her to leave.  At one point, appellant put the gun down by his side.  Then he took a pillow from the couch and placed it in front of the gun.  Dreadlocks told appellant, "You got to do him now because you done pulled a gun on him.  You got to do him."  When appellant said that he was going to "give him a pass," Dreadlocks urged appellant to shoot Mr. Williamson so that he would not come after appellant and shoot him.  Appellant shot Mr. Williamson in the abdomen, after which appellant and Dreadlocks ran from the house.  Ms. Dillard called the police.  Mr. Williamson denied having a gun in his possession on the day of the shooting.

Ms. Dillard was interviewed by Officer Peralez on May 30, 2009, shortly after the incident and again later.  A recording of both the interviews was played for the jury.  In her first statement, Ms. Dillard claimed she was in the bathroom when she heard a pop sound.  After Officer Peralez spoke with Ms. Dillard's daughter, who told him that she saw a gun, Officer Peralez re-interviewed Ms. Dillard and confronted her with her daughter's statement that she saw a gun.  Ms. Dillard confessed that she saw both appellant and the "other guy" pull out guns and argue with Mr. Williamson.  Ms. Dillard testified that it was Dreadlocks that had the pillow in front of his gun, but admitted that she told a detective that appellant put a pillow in front of his gun.  However, she testified that she said that because she was scared.  Much of Ms. Dillard's trial testimony differed from the accounts she gave officers after the incident in that she tried to place the blame on Dreadlocks and that it was Mr. Williamson that had a gun not appellant.[5]  She admitted that she loved appellant.

---

[5]     The jury heard a recording of Ms. Dillard's statements that she gave to Detective Barbara Melloch on June 2, 2009.

4

Ms. Dillard's daughter, who was eight years old at the time of trial, testified that she saw Dreadlocks get angry with Mr. Williamson; she saw Dreadlocks point a gun at him. Her mother told her to go into the bathroom and lock the door. Inside the bathroom, she heard a gunshot.

*Defense Evidence*

Appellant did not testify. However, the defense called Officer Billy Beason of the Hercules Police Department to testify about prior incidents of domestic violence involving Mr. Williamson in order to attack Mr. Williamson's credibility. The court gave the jury a limiting instruction and informed them that alleged domestic violence incidents involving Mr. Williamson and his former girlfriend did not result in any conviction.[6]

In addition to Officer Beason, the defense called Ray Hernandez, an investigator with the Santa Clara County District Attorney's Office. He testified that he interviewed Ms. Lewis on March 17, 2010. She told him that Mr. Williamson may have been making advances toward her during the car ride on the day of the shooting. She said that Mr. Williamson pulled out a large sum of money and seemed to be trying to impress her. Investigator Hernandez interviewed Mr. Williamson on March 18, 2010; Mr. Williamson acknowledged that he had owned a gun in the past.

*Discussion*

*Alleged Brady Violation*

*Background*

Following appellant's conviction, defense counsel filed a non-statutory motion to set aside appellant's conviction based on a *Brady* violation. Defense counsel argued that according to Ray Hernandez's investigative reports received after the trial had concluded, the true identity of the person known as Dreadlocks at trial became known to the

---

[6]     Officer Beason told the jury that he had responded to a call regarding domestic violence. He spoke to Mr. Williamson's former girlfriend who told him that Mr. Williamson had punched her on her head twice and once on her left shoulder.

investigator on March 26, 2010, when Ms. Lewis positively identified that person's Department of Motor Vehicles photograph.  Defense counsel alleged that neither the true identity of Dreadlocks nor his whereabouts were revealed to the defense during trial; however, the prosecutor, during argument, had mentioned the name Ryne Scott for the first time in connection with telling the jury that they were not to be concerned with what Dreadlocks/Ryne Scott was doing.  Defense counsel stated that less than a week after the trial ended, Mr. Scott was taken into custody and gave a statement to Investigator Hernandez at the Alameda County Jail, in which in essence, Mr. Scott said that there was a tussle between appellant and Mr. Williamson over Mr. Williamson's gun and the gun went off.  Mr. Scott adamantly denied that he told appellant to shoot Mr. Williamson.  Counsel argued that the prosecution was obligated under *Brady* to disclose this information to the defense because Mr. Scott's "version of events would have been extremely favorable to the defense."

The prosecutor filed opposition to the motion in which he provided a lengthy detailed chronology of events surrounding the discovery of Mr. Scott's true name and whereabouts.  The prosecutor argued that learning Mr. Scott's name was not in and of itself *Brady* evidence.  Further, the prosecutor asserted that appellant already knew the whereabouts of Mr. Scott because they were friends and it was appellant that brought him to Ms. Dillard's house on May 30, 2009.  According to the prosecutor, an arrest warrant issued for Mr. Scott on April 5, 2010; he was arrested at his home in Oakland on April 13, 2010.  Thereafter, on April 19, 2010, Investigator Hernandez took a statement from Mr. Scott in which he said that appellant picked him up at his house on the night of the shooting.  Mr. Scott's statement to the investigator was turned over to defense counsel within a few days.

At the hearing on appellant's motion, the prosecution and defense stipulated that Investigator Hernandez showed Ms. Lewis a photograph of Ryne Scott on March 26, 2010; she identified him.  Accordingly, as of that date, the prosecution knew Mr. Scott's

full legal name, his date of birth, and his precise address. While agreeing to the stipulation, the prosecutor added that he personally did not know Mr. Scott's name, date of birth and address until April 2, 2010, and even then he was under the impression that Mr. Scott's first name was Ryan.

The court took judicial notice that the prosecutor's opening statement took place on March 29, 2010, and closing statements occurred on April 5, 2010. The jury returned its guilty verdict on April 7, 2010.

Defense counsel pointed out to the court that in Mr. Scott's statement to Investigator Hernandez, Mr. Scott said that Mr. Williamson had two weapons on him during the incident; counsel argued that Mr. Scott's exhortation to appellant to shoot Mr. Williamson was conspicuously absent from Mr. Scott's statement. According to counsel, Mr. Scott described the shooting as "an accidental discharge and implied that there was a struggle over a firearm at one point in time." Counsel asserted that if the defense had been able to locate Mr. Scott, and if Mr. Scott had testified, he would have given testimony similar to the statement he gave Investigator Hernandez, which would have contradicted Mr. Williamson's testimony about being unarmed.

The prosecutor asserted that during appellant's trial law enforcement officers were actively hunting for Mr. Scott, who was considered a codefendant. After Ms. Lewis identified Mr. Scott's photograph, the prosecution had only Mr. Scott's name, date of birth, and address. The prosecution did not have a statement from Mr. Scott or any exculpatory evidence. The prosecutor speculated that it was unlikely that Mr. Scott once he was found and charged would have taken the witness stand to testify. The prosecutor argued that Mr. Scott's statements to Investigator Hernandez were self-serving because he said, " 'I never saw the shooting. I saw a gun that was within the reach of both Mr. Travis and Mr. Williamson and I coincidentally or luckily turned my head and heard a shot.' " As a final point, the prosecutor argued that appellant, who had known Mr. Scott for a

7

long time and had picked Mr. Scott up at Mr. Scott's house on the night of the shooting,[7] knew Mr. Scott's whereabouts.

Appellant took the witness stand and testified that he had known Mr. Scott since 2005 or 2006. Appellant said that Mr. Scott was not a close friend, rather he was somebody he knew and they would "hang out" occasionally. Appellant denied knowing exactly where Mr. Scott lived, but knew the general area. Appellant claimed to have picked up Mr. Scott on "90th" in Oakland on the day of the shooting.[8] Appellant acknowledged that between the time of the incident and him being arrested he had spoken to Mr. Scott. Appellant claimed to have Mr. Scott's telephone number memorized. However, he confirmed that telephone number was 510-809-7857.

Before appellant testified, the court asked for clarification on the telephone number for Mr. Scott that Ms. Lewis had provided to a defense investigator. According to the court, in his declaration the defense investigator stated that he had received a telephone number of 510-302-7785 for Mr. Scott back in October 2009 and had attempted to contact Mr. Scott on that number. The prosecutor confirmed that the number was an accurate telephone number for Mr. Scott and was used to ultimately identify Mr. Scott. At this point in the proceedings, defense counsel did not dispute that his investigator had the correct telephone number for Mr. Scott.

On cross-examination, appellant disputed Mr. Scott's statement that he had been picked up from his house by appellant on the day of the shooting. Appellant insisted that he picked up Mr. Scott that day at 90th and McArthur. Appellant admitted that he had Mr. Scott's telephone number; during the 12 days between the shooting and the time appellant was arrested, appellant admitted that he spoke to Mr. Scott a few times.

---

[7]   In his statement to Investigator Hernandez, Mr. Scott claimed that he was picked up from his house in Oakland by appellant.

[8]   We assume that appellant meant 90th Avenue.

Under questioning from the court, appellant testified that he had Mr. Scott's telephone number recorded in his cellular phone and that Mr. Scott's name would come up when Mr. Scott called him. However, appellant disputed that the number he had was the same number used by the prosecution to locate Mr. Scott.

The court made a finding that it did not believe appellant did not know Mr. Scott's whereabouts. Specifically, the court stated, "I don't believe the defendant did not know the whereabouts of Mr. Scott both based on his testimony, his body language in testifying, the close relationship they appeared to have and the fact that Ryne Scott said that without knowing it was going to harm the defendant because it seemed pretty innocuous, that the defendant picked him up at his house."

At the conclusion of the hearing, the court found not "one scintilla of evidence to support a Brady violation in this case." The court went on to say that the prosecution possessed nothing exculpatory as to appellant. Furthermore, even if the defense could have obtained a statement from Mr. Scott similar to the one Mr. Scott gave Investigator Hernandez, the court would have found it inadmissible because it was "clearly self-serving" and unreliable and thus not a declaration against interest.

The court found it unlikely that Mr. Scott would have testified at appellant's trial and given exculpatory testimony. Specifically, the court said, "These are a lot of speculations, most of them based on premises that are not reasonable and do not normally take place that he possibly would have given a statement once he's charged, to the defense. There would have been the same statement whenever it was taken, that he possibly would have gotten on the stand. Very rare, almost never. And he possibly could have testified and gave the same self-serving statement."

In addition, the court found that "the defendant in this case could have obtained any evidence from Ryne Scott with any reasonable diligence. And that's because he was the only one that knew where Ryne Scott lived. Everyone else was on a fishing expedition basically."

9

Accordingly, the court denied appellant's motion to set aside his conviction based on a *Brady* violation.

Appellant argues that Mr. Scott's true name and location was potentially exculpatory evidence that the prosecution was required to disclose to the defense. In other words, there was a *Brady* violation in this case and the court erred in finding that there was not.

In *Brady,* the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady, supra,* 373 U.S. at p. 87.) The high court has extended the prosecutor's duty to encompass the disclosure of material evidence, even if the defense made no request concerning the evidence. (*United States v. Agurs* (1976) 427 U.S. 97, 107.) The duty encompasses impeachment evidence as well as exculpatory evidence. (*United States v. Bagley* (1985) 473 U.S. 667, 676 (*Bagley*).) Such evidence is material, however, "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 682.) Defendant has the burden of showing materiality. (*In re Sassounian* (1995) 9 Cal.4th 535, 545.)

To put it another way, to merit relief on *Brady* grounds, "the evidence a prosecutor failed to disclose must have been both favorable to the defendant and material on either guilt or punishment. Evidence would have been *favorable* if it would have helped the defendant or hurt the prosecution, as by impeaching one of its witnesses. Evidence would have been *material* only if there is a reasonable probability that, had it been disclosed to the defense, the result would have been different." (*People v. Dickey* (2005) 35 Cal.4th 884, 907 (*Dickey*).)

10

Thus, "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." (*Strickler v. Greene* (1999) 527 U.S. 263, 281–282.) We review the elements of a *Brady* claim de novo. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042.)

Initially, we point out, "The scope of a prosecutor's disclosure duty includes not just exculpatory evidence in *his* possession but that possessed by investigative agencies to which he has reasonable access." (*People v. Robinson* (1995) 31 Cal.App.4th 494, 499 (*Robinson*).) Thus, for purposes of this appeal the prosecutor knew as of March 26, 2010, Mr. Scott's true name and address.

Under the circumstances presented here, we find the court did not err in determining a *Brady* violation did not occur. First, this is not a case where the prosecution suppressed the identity of an eyewitness as in *Robinson*, *supra*, 31 Cal.App.4th 494. In *Robinson* the prosecution had knowledge of an eyewitness who had been interviewed by an arson investigator immediately after a suspect fire. The witness did not see the defendant but implicated another individual. Defense counsel learned of the witness only indirectly and belatedly during cross-examination of another witness. The court in *Robinson* concluded there was a distinct possibility the undisclosed witness would have testified another individual, not the defendant, caused the fire. The withholding of this exculpatory evidence by the district attorney was held to violate *Brady* and the judgment was reversed. (*Id.* at pp. 502–503.)

Mr. Scott's existence, if not his true name, was known to defense counsel early on as evidenced by a defense investigator's report, dated November 23, 2009, of an interview of Ms. Lewis where she stated that "Reezy" was with appellant at Aretha's house, and she spoke with him the next day and found out what had transpired. Further, Ms. Lewis's statement to the defense investigator included her telling him that Reezy told

11

her that Mr. Williamson had a gun with him the whole night and brought it out. She indicated she could not remember exactly what Reezy said except that appellant got the gun away from Mr. Williamson and shot him and there might have been a struggle over the gun and appellant accidently shot Mr. Williamson. Thus, defense counsel was fully aware that Reezy was a potential witness to the shooting and could possibly have provided evidence favorable to his client.

More importantly, the undisclosed evidence was Mr. Scott's true name and location, information which by itself has no exculpatory value.

Although the prosecution may not withhold favorable and material evidence from the defense, neither does it have the duty to conduct the defendant's investigation for him. (*People v. Morrison* (2004) 34 Cal.4th 698, 715 (*Morrison*).) If the material evidence is in a defendant's possession or is available to a defendant through the exercise of due diligence, then, at least as far as evidence is concerned, the defendant has all that is necessary to ensure a fair trial, even if the prosecution is not the source of the evidence. (*Coe v. Bell* (6th Cir.1998) 161 F.3d 320, 344; *U.S. v. Pandozzi* (1st Cir.1989) 878 F.2d 1526, 1529–1530.) Accordingly, evidence is not suppressed unless the defendant was actually unaware of it and could not have discovered it by the exercise of reasonable diligence. (*Morrison, supra,* 34 Cal.4th at p. 715.) The *Brady* rule does not displace the adversary system as the primary means by which truth is uncovered. (*United States v. Martinez–Mercado* (5th Cir.1989) 888 F.2d 1484, 1488.) Accordingly, "when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim." (*United States v. Brown* (5th Cir.1980) 628 F.2d 471, 473; see also *United States v. Stuart* (8th Cir.1998) 150 F.3d 935, 937 [Evidence is not suppressed if the defendant has access to the evidence prior to trial by the exercise of reasonable diligence]; *United States v. Slocum* (11th Cir.1983) 708 F.2d 587, 599 [newly-discovered evidence does not warrant a new trial unless, inter alia, the evidence is

12

discovered *following* trial and the movant demonstrates due diligence to discover the evidence *prior to* trial].)

In this case appellant's *Brady* claim is defeated by the fact that appellant had a close relationship with Mr. Scott, and despite his protestations to the contrary, as the lower court found, knew where Mr. Scott lived and how to locate him. "There is no *Brady* violation 'where a defendant "knew or should have known the essential facts permitting him to take advantage of any exculpatory information," or where the evidence is available . . . from another source,' because in such cases there is really nothing for the government to disclose. [Citations.]" (*Coe v. Bell*, *supra*, 161 F.3d at p. 344.)

Accordingly, we find no *Brady* violation in this case.

*Exclusion of Evidence that Mr. Williamson Raped a Former Girlfriend*

*Background*

After the prosecution finished its case in chief, the court held an Evidence Code section 402 hearing (402 hearing) to determine the admissibility of evidence concerning alleged prior incidents of misconduct by Mr. Williamson. Officer Billy Beason testified at the 402 hearing that on August 3, 2007, he responded to a call about a rape and domestic violence incident. He contacted Jessica Powell who was visibly shaken and "teary eyed." When Officer Beason questioned Ms. Powell she told him that her former boyfriend Fred Williamson had beaten her and raped her twice. She said that she called the police right after Mr. Williamson left. Officer Beason saw a fresh bruise on Ms. Powell's left shoulder and it appeared as if she was in pain. A SART examination[9] was performed on Ms. Powell, but Mr. Williamson was never prosecuted.

The court questioned Officer Beason regarding a conversation the officer had with Ms. Bell, a friend of Ms. Powell. Ms. Bell was with Ms. Powell while Officer Beason was there. Ms. Bell told him that she received a text message saying " 'Fred hit me.' "

---

[9]     SART stands for Sexual Abuse Response Team.

13

Ms. Bell told Officer Beason that when she telephoned Ms. Powell, Ms. Powell was crying and said, "Fred hit me." Officer Beason had noted in his report that Ms. Powell had told him that she had had consensual sex with Mr. Williamson two months earlier. In addition, Ms. Powell said that when Mr. Williamson wanted to have sex with her she told him that she was "on [her] period." Four Kotex pads were seized as evidence.

The court listened to a recording of Ms. Powell's 911 telephone call.[10] According to the prosecutor, at one point on the telephone call Ms. Powell said she was being raped. According to the court, when asked when it happened, at first she said that it was a long time ago and then she said it did not happen a long time ago.

Defense counsel informed the court that Ms. Powell refused to testify; she was pregnant and about to give birth. As a consequence, defense counsel wanted to call Officer Beason to testify about what Ms. Powell had told him for the purpose of impeaching Mr. Williamson's credibility. The prosecutor argued that neither Ms. Powell's statements to the 911 operator, nor to Officer Beason were excited utterances and that the authenticity of the 911 tape could not be proved. The prosecutor said that there was no evidence that a rape occurred and suggested that Ms. Powell's refusal to cooperate could mean that at the time she had lied about what happened because she was angry with Mr. Williamson. The prosecutor argued that evidence of Ms. Powell's statements should be excluded under Evidence Code section 352.

The court found that Ms. Powell's allegations of prior bad acts were "complicated by a lot of factors." Ultimately, the court ruled that Officer Beason could testify to the domestic violence incident, but not the rape allegations; further, the court ruled

---

[10] The record does not contain a transcript of the 911 telephone call, nor has appellant supplied this court with a copy of the tape.

inadmissible the 911 recording because the court was concerned with the trustworthiness of Ms. Powell's allegation that she had been raped on that day.[11]

The court made a record of its considerations under Evidence Code section 352. Specifically, the court stated, "Just a few more comments under 352, I find it far more prejudicial than probative to allow anything regarding the rape under all the circumstances I talked about, the alleged rape that occurred. There wasn't enough credible evidence and certainly no probative value over the prejudicial effect that it would have had. [¶] Such an inflammatory charge that was unsubstantiated. The battery however was a close call, I thought there was enough evidence to show that there was, even though obviously little concerned the alleged victim can't be cross-examined regarding it and I find that more probative than prejudicial. It's not going to be as inflammatory but still be somewhat inflammatory and it has some probative value as to credibility, as to Mr. Williamson's credibility."

Accordingly, Officer Beason was allowed to testify as noted *ante*.

Appellant contends that the court erred in allowing Officer Beason to testify about Ms. Powell's allegations of domestic violence, but not about being raped. Appellant argues, "Powell was clear in her statement to Officer Beason that she was both assaulted and raped within a three hour period before she called 911."

In *People v. Wheeler* (1992) 4 Cal.4th 284 ( *Wheeler* ), our Supreme Court held that a person can be impeached in a criminal case by evidence of prior misdemeanor conduct that involves moral turpitude, provided such evidence is not excluded under Evidence Code section 352. (*Id*. at pp. 295–297 & fn. 7.) This is so because

_____

[11] The court allowed Ms. Powell's statements to come in under Evidence Code section 1240, the spontaneous declaration exception to the hearsay rule. The court felt that because the officer could see bruises on Ms. Powell and she appeared to be in pain, her statements to Officer Beason that she had been beaten were trustworthy. However, because of her contradictory statements about when the rape had occurred and because there was no corroborating evidence from the SART examination her statement about being raped could not.

"[m]isconduct involving moral turpitude may suggest a willingness to lie . . . ." (*Id.* at p. 295.) "Of course, the admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude. [Fn. omitted.] Beyond this, the latitude section 352 allows for exclusion of impeachment evidence in individual cases is broad." (*Id.* at p. 296.) Similarly, "[a] witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352." (*People v. Clark* (2011) 52 Cal.4th 856, 931.)

Certainly, domestic violence is a crime of moral turpitude (*People v. Rodriguez* (1992) 5 Cal.App.4th 1398, 1402), as is rape. (*People v. Lewis* (1987) 191 Cal.App.3d 1288, 1295; *People v. Mazza* (1985) 175 Cal.App.3d 836, 844.)

Nevertheless, Evidence Code section 352 provides that the trial court may, in its discretion, exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.[12]

Assuming, without deciding, the evidence of the rape allegation was erroneously excluded, we review errors in the application of the "ordinary rules of evidence" under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Marks* (2003) 31 Cal.4th 197, 226–227.) Under the *Watson* standard, if a trial court erroneously excludes evidence, a defendant must show on appeal that it is reasonably probable he or she would have received a more favorable result had that evidence been admitted. (*Watson,* at p. 836; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1125.)

---

[12] We point out that a trial court has discretion to exclude impeachment evidence if it is collateral, irrelevant, cumulative, confusing, or misleading. (*People v. Price* (1991) 1 Cal.4th 324, 412.)

Appellant makes the bare assertion that the exclusion of the evidence of the rape accusation was prejudicial since the case turned on Mr. Williamson's credibility. We are not persuaded.

Even though Mr. Williamson's credibility was an issue, the jury was already aware from the court's instruction to the jury before Officer Beason testified that the domestic violence allegation could be used in assessing Mr. Williamson's credibility. We find no reasonable probability that the outcome would have been different if Mr. Williamson had been impeached with evidence of the rape allegation, which was cumulative to the other impeachment evidence adduced by the defense. Appellant has the burden of demonstrating that there would have been a significantly different impression of the witness's credibility had the proposed impeachment been permitted. (*People v. Williams* (1997) 16 Cal.4th 153, 207-208.) Appellant has failed to carry that burden.

*Disposition*

The judgment is affirmed.

_____

ELIA, Acting P. J.

WE CONCUR:

_____

BAMATTRE-MANOUKIAN, J.

_____

MÁRQUEZ, J.